Christopher Sprigman (CS-7310)
Associate Professor
University of Virginia School of Law
580 Massie Road
Charlottesville, VA 22903-1789
Tel: 434-924-6331
Fax: 434-924-7536
*Attorney for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC., CBS BROADCASTING INC., DISNEY ENTERPRISES, INC., FOX BROADCASTING COMPANY, SPELLING TELEVISION INC., SUPERSTATION, INC., TBS FUNDING CORP., TURNER ENTERTAINMENT NETWORKS, INC., TURNER NETWORK TELEVISION LP, LLLP, UNIVERSAL NETWORK TELEVISION LLC, and UNIVERSAL TELEVISION NETWORKS,<br><br>Plaintiffs,<br><br>- against -<br><br>FLYING J, INC. and TON SERVICES, INC.,<br><br>Defendants. | No. 06 CV 2967 (DAB) |

**DECLARATION OF CHRISTOPHER SPRIGMAN**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

I, CHRISTOPHER SPRIGMAN, declare pursuant to 28 U.S.C. § 1746, as follows:

1. I am an associate professor of law at the University of Virginia School of Law, a member in good standing of the bar of the State of New York admitted to practice before this Court, and counsel to defendants. I make this declaration in support of the motion to dismiss of defendants Flying J, Inc. and TON Services, Inc.

2. Attached hereto as Exhibit A is a true and correct copy of an "Incentivized Retailer Agreement" between defendant Flying J, Inc. and EchoStar Satellite LLC.

3. Attached hereto as Exhibit B is a true and correct copy of a "Commercial Amendment" to the "Incentivized Retailer Agreement" and also an "Addendum" thereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 5, 2006
Charlottesville, VA

/s/
Christopher Sprigman (CS-7310)

Exhibit A

Echosphere Retailer Number ______________

**ECHOSTAR SATELLITE L.L.C.**
**INCENTIVIZED RETAILER AGREEMENT**

This Agreement (the "Agreement") is made and effective as of this ____ day of ______________, 2004, by and between EchoStar Satellite L.L.C., formerly known as EchoStar Satellite Corporation, ("EchoStar") having a principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112, and ______________________________________ having a principal place of business at ______________________________________ ("Retailer").

**INTRODUCTION**

A. EchoStar is engaged, among other things, in the business of providing digital direct broadcast satellite (DBS) services under the name DISH Network.

B. Retailer, acting as an independent contractor, desires to become authorized on a non-exclusive basis, to market, promote, and solicit orders for Programming (an "Authorized Retailer").

C. EchoStar desires to appoint Retailer as an Authorized Retailer in accordance with and subject to the terms and conditions of this Agreement.

**AGREEMENT**

1. REPRESENTATIONS AND WARRANTIES The parties hereto make the following representations and warranties with the specific intent to induce the other party into entering into this Agreement and recognize that the other party would not enter into this Agreement but for the following representations and warranties:

1.1 Each party represents that the execution, delivery and performance of this Agreement have been duly authorized and that it has the full right, power and authority to execute, deliver and perform this Agreement.

1.2 Each party represents that the signatures hereon are genuine and the person signing on behalf of each party is authorized by the respective party to execute the Agreement on its behalf.

1.3 Retailer represents that (i) it is a valid and existing entity in compliance with all laws and regulations related to maintenance of its corporate or other business status; (ii) it is not currently insolvent; (iii) it is not violating any federal, state or local law or regulation; (iv) it has never engaged in any of the acts prohibited under Section 3.6, 3.7, 9.2, 9.3 or 9.4 below; (v) it has not engaged in any acts which would have resulted in automatic termination or be considered default or breach under any current or former retailer agreement with EchoStar or under any current or former Other Agreement; and (vi) it is not dependent upon EchoStar or its Affiliates for a major part of Retailer's business and that Retailer either sells or could sell other products or services in addition to EchoStar products or services that compete with EchoStar products or services.

1.4 EACH PARTY HERETO WARRANTS AND REPRESENTS THAT IT HAS READ THIS AGREEMENT IN ITS ENTIRETY AND THAT IT UNDERSTANDS FULLY EACH OF THE TERMS AND CONDITIONS SET FORTH HEREIN.

1.5 EACH PARTY HERETO WARRANTS AND REPRESENTS THAT IT HAS BEEN GIVEN THE OPPORTUNITY TO HAVE INDEPENDENT COUNSEL REVIEW THIS AGREEMENT PRIOR TO EXECUTION. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT EITHER THIS AGREEMENT HAS BEEN ACTUALLY REVIEWED BY ITS COUNSEL OR THAT SUCH PARTY HAS DECLINED TO HAVE ITS COUNSEL DO SO.

1.6 EACH PARTY HERETO REPRESENTS AND WARRANTS THAT IT IS NOT RELYING UPON ANY STATEMENTS OR REPRESENTATIONS NOT CONTAINED HEREIN AND THAT IT HAS NOT BEEN INDUCED INTO ENTERING THIS AGREEMENT BY ANY STATEMENTS, ACTS OR OMISSIONS NOT EXPRESSLY SET FORTH HEREIN.

1.7 EACH PARTY HERETO REPRESENTS AND WARRANTS THAT IT HAS NOT BEEN COERCED INTO ENTERING INTO THIS AGREEMENT AND THAT IT HAS ENTERED INTO THIS AGREEMENT OF ITS OWN FREE WILL AND FREE OF INFLUENCE OR DURESS.

1.8 RETAILER WARRANTS AND REPRESENTS THAT BEFORE IT WILL PARTICIPATE IN ANY PROMOTIONAL PROGRAM IT WILL CAREFULLY REVIEW THE TERMS OF THE PROGRAM AND ASSOCIATED BUSINESS RULES OR HAVE THEM REVIEWED BY INDEPENDENT COUNSEL.

DES

2. DEFINITIONS. In addition to the terms defined elsewhere in this Agreement, the following definitions shall apply to this Agreement:

2.1 "Affiliate" means any person or entity directly or indirectly controlling, controlled by or under common control with another person or entity.

2.2 "Business Rule" means any term, requirement, condition, condition precedent, process or procedure associated with a Promotional Program or otherwise identified as a Business Rule by EchoStar which is communicated to Retailer by EchoStar or an Affiliate of EchoStar either directly (including email) or through any method of mass communication reasonably directed to EchoStar's retailer base, including, without limitation, a "Charlie Chat", email, fax blast, or posting on EchoStar's retailer web site. Retailer agrees that EchoStar has the right to modify the Business Rules at any time and from time to time in its sole discretion for any reason, upon notice to Retailer.

2.3 "Certificate Program" means any Promotional Program offered by EchoStar wherein Retailer purchases a serialized certificate (a "Promotional Certificate") from EchoStar, any Affiliate of EchoStar, or a Third Party Manufacturer for resale to a consumer which, among other things, entitles such consumer to a DISH DBS System (or the use of such system, if the program involves leasing the equipment to the consumer) and installation.

2.4 "Chargeback" means EchoStar's right to reclaim Incentives to which Retailer is not entitled pursuant to the terms and conditions of this Agreement, any Promotional Program, or applicable Business Rules.

2.5 "DISH DBS System" means an MPEG-2 DVB compliant satellite receiver and related components (if any) packaged therewith, intended to be utilized for the reception of Programming delivered by satellite transponders owned and operated by EchoStar or its Affiliates, which is: (i) sold directly to Retailer by EchoStar or an EchoStar Affiliate under the "EchoStar" brand name or the brand name of an EchoStar Affiliate; or (ii) sold directly to Retailer by a Third Party Manufacturer pursuant to authorization granted by EchoStar under the brand name of such Third Party Manufacturer.

2.6 "EchoStar Subscriber" shall have the meaning set forth in Section 7.4.

2.7 "Eligible Programming" means the Programming packages designated by EchoStar as qualifying for the payment of Incentives under this Agreement, as set forth in the Business Rules, as such Business Rules may be modified in whole or in part at any time and for any reason in EchoStar's sole discretion, upon notice to Retailer.

2.8 "EFT" means the electronic transfer of funds from one financial institution to another.

2.9 "Incentives" mean the Monthly Incentives together with any Additional Incentives, as such terms are defined in Section 6, below.

2.10 "Programming" means the DISH Network video, audio, data and interactive programming services which EchoStar makes generally available to the public for viewing in Residential Locations, subject to any restrictions (geographic, blackout or otherwise) as EchoStar may impose on some or all such Programming services for any reason in its sole discretion. EchoStar reserves the right to change the Programming services offered and/or any restrictions applicable to such Programming services at any time and for any reason in EchoStar's sole discretion.

2.11 "Promotional Program" means: (i) a promotional offer, as determined by EchoStar, which Retailer may present to consumers in connection with Retailer's promotion and solicitation of orders for Programming; (ii) the Incentives, as determined by EchoStar, which Retailer may receive in connection with such promotional offer; and (iii) the Business Rules, as determined by EchoStar, setting forth the terms and conditions governing the promotional offer and corresponding Incentives. EchoStar reserves the right to discontinue any Promotional Program or change the Business Rules associated therewith at any time and for any reason in its sole discretion, upon notice to Retailer.

2.12 "Qualifying Residential Subscriber" means an individual at a Residential Location in the Territory who orders Eligible Programming, who timely pays for the Programming in full and who has not violated any of the terms and conditions set forth in the EchoStar Residential Customer Agreement, and who has never previously received any audio, video, data, or any other programming services from EchoStar or any Affiliate of EchoStar. A Qualifying Residential Subscriber shall not include any individual who would otherwise qualify, but whose equipment EchoStar, in its sole discretion, declines to activate for any reason.



JS

2.13 "Residential Location" means a single family residential dwelling (i.e. single family houses, apartments, condominiums or other dwellings used primarily for residential purposes), located in the Territory; provided, however, in no case shall any satellite master antenna television system or private cable system in a residential multiple dwelling unit or any similar programming reception system (e.g., dormitories, etc.) be considered a Residential Location. EchoStar reserves the right to determine, in its sole discretion for any reason, whether a location constitutes a Residential Location, or is more appropriately considered a commercial or other non-residential location.

2.14 "Retailer Account" means the bank account, including account and ABA routing numbers, designated by Retailer in the manner reasonably prescribed by EchoStar, which Retailer may change from time to time by providing at least sixty (60) days prior written notice to EchoStar.

2.15 "Subscriber Account" means the account set up and maintained by EchoStar for a Qualifying Residential Subscriber who purchased a DISH DBS System from Retailer and for whom Eligible Programming has been activated by EchoStar and which account remains active and in good standing.

2.16 "Third Party Manufacturer" means a third party manufacturer authorized by EchoStar or any Affiliate of EchoStar to market, distribute and sell DISH DBS Systems under its own brand name.

3. <u>APPOINTMENT; TERRITORY</u>

3.1 <u>Appointment</u>. EchoStar appoints Retailer as a non-exclusive Authorized Retailer to promote and solicit orders for Programming, subject to all of the terms and conditions of this Agreement. The appointment set forth herein for the promotion of the DISH Network by Retailer shall apply to the same DBS service which may be operated by EchoStar or its Affiliates under a different name in the future. Retailer's authorization herein is limited to the solicitation of orders for Programming from, and the marketing, advertising and promotion of Programming to, consumers at Residential Locations unless EchoStar, in its sole discretion (which may be exercised for any reason), specifically agrees in writing to permit Retailer to solicit orders from, or promote Programming to, others.

3.2 <u>Territory</u>. Retailer's authorization hereunder, and any actions it undertakes in connection with, or in furtherance of, this Agreement, shall be limited solely to the area within the geographic boundaries of the United States and its territories and possessions (the "Territory").

3.3. <u>Acceptance</u>. Retailer accepts its appointment as an Authorized Retailer and agrees to use its reasonable commercial efforts to continuously and actively advertise, promote and market the Programming and to solicit orders therefore, subject to and in accordance with all of the terms and conditions of this Agreement. Retailer understands that it may hold itself out to the public as an Authorized Retailer of EchoStar only after fulfilling, and for so long as it continues to fulfill, all of the duties, obligations, and requirements contained in this Agreement and the Business Rules, and only during the Term of this Agreement.

3.4 <u>Non-Exclusivity</u>. Retailer acknowledges that: (i) nothing in this Agreement is intended to, nor shall it be construed as conferring any exclusive territory or any other exclusive rights to Retailer; (ii) EchoStar and its Affiliates make absolutely no promises, representations or warranties as to the amount of business or revenue that Retailer may expect to derive from participation in this Agreement or any Promotional Program; (iii) Retailer may not realize any business or revenue as result of its participation in this Agreement or any Promotional Program; (iv) nothing contained herein shall be construed as a guarantee of any minimum amount of Incentives or any minimum amount of other payments, income, revenue or other economic benefit in any form whatsoever; (v) EchoStar currently offers, and at any time in the future may offer in its sole discretion for any reason, others the opportunity to act as an Authorized Retailer or to solicit orders for Programming in the same geographic area in which Retailer is located and elsewhere; (vi) Echosphere L.L.C. and all other Affiliates of EchoStar shall have the right to distribute products and solicit orders for Programming throughout the Territory and the entire United States, and in competition with Retailer, without any obligation or liability to Retailer whatsoever, and without providing Retailer with any notice thereof; (vii) EchoStar and its Affiliates shall be entitled, among other things, to: (a) solicit orders for Programming, (b) sell, lease and otherwise transfer possession of DISH DBS Systems and Promotional Certificates, and (c) perform installation and maintenance services (directly and through subcontractors) for DISH DBS Systems and related accessories, in each case throughout the Territory and in competition with Retailer, without any obligation or liability to Retailer whatsoever, and without providing Retailer with any notice thereof; and (viii) EchoStar shall be free to cease or suspend provision of the Programming services, and shall incur no liability to Retailer by virtue of any such cessation or suspension.

3.5 <u>Purchase of DISH DBS Systems by Retailer from EchoStar</u>. In the event that Retailer orders any DISH DBS Systems or Promotional Certificates from Echosphere L.L.C. or any other Affiliate of EchoStar (collectively, "Echosphere" for purposes of this section), Retailer shall order such products by written purchase order ("Purchase Order") issued during the term of this Agreement. A Purchase Order shall be a binding commitment by Retailer. Any failure to confirm a Purchase Order shall not be deemed acceptance by Echosphere. Purchase Orders of Retailer shall state only the: (i) identity of goods; (ii) quantity of goods; (iii) purchase price of goods; and (iv) requested ship date of goods. Any additional terms stated in a Purchase Order shall not be binding upon Echosphere unless expressly agreed to in writing by Echosphere. In no event shall EchoStar or Echosphere be liable for any delay, or failure to fulfill, any Purchase Order (or any portion thereof), regardless of the cause of such delay or failure. In the event of any conflict between the terms of

a Purchase Order and the terms of this Agreement, the terms of this Agreement shall prevail. Echosphere shall be considered a third party beneficiary of Retailer's obligations under this Agreement. Retailer hereby acknowledges and agrees that EchoStar and its Affiliates have no obligation to re-purchase DISH DBS Systems or Promotional Certificates back from Retailer at any time for any reason.

3.6 Sale of DISH DBS Systems. Retailer agrees that as a condition precedent to eligibility to receive Incentives from EchoStar, it will not directly or indirectly sell, lease, or otherwise transfer possession of a DISH DBS System or Promotional Certificate to any person or entity whom Retailer knows or reasonably should know: (i) is not an end-user and/or intends to resell, lease or otherwise transfer it for use to another individual or entity; or (ii) intends to use it, allow others to use it, or to resell, lease or otherwise transfer it for use in any location other than a Residential Location; or (iii) intends to use it, or to allow others to use it, or to resell, lease or otherwise transfer it for use in Canada, Mexico or at any other location outside of the Territory; or (iv) intends to have, to allow others to have, or to resell, lease or otherwise transfer it to others who will have Programming authorized for it under a single DISH Network account that has or will have Programming authorized for multiple satellite receivers that are not all located in the same Residential Location and connected to the same phone line. It shall be Retailer's responsibility to investigate and determine whether any sale by Retailer would be in violation of this Section. In the event that Retailer directly or indirectly sells, leases or otherwise transfers possession of a DISH DBS System or Promotional Certificate to a person or entity who uses it, allows others to use it, or resells, leases or otherwise transfers it for use to permit the viewing of Programming in a non-Residential Location or any other area open to the public, then Retailer agrees to pay to EchoStar upon demand: (a) the difference between the amount actually received by EchoStar for the Programming authorized for the DISH DBS System and the full commercial rate for such Programming (regardless of whether EchoStar has or had commercial distribution rights for such Programming); and (b) the total amount of any admission charges or similar fees imposed for listening to or viewing such Programming (regardless of whether such charges and/or fees were imposed or collected by Retailer). In the event that Retailer directly or indirectly sells, leases or otherwise transfers possession of a DISH DBS System or Promotional Certificate to a person or entity who has, allows others to have, or resells, leases or otherwise transfers it to others who have Programming authorized for it under a single DISH Network account that at any time has Programming authorized for multiple DISH DBS Systems that are not all located in the same Residential Location and connected to the same phone line, and Retailer knew or reasonably should have known that the person or entity intended to have, allow others to have or resell, lease or otherwise transfer it to others who would have Programming authorized for the DISH DBS System under such an account, then Retailer agrees to pay to EchoStar upon demand, the difference between the amount actually received by EchoStar for the Programming authorized under the single account and the full retail price for such Programming had each DISH DBS System authorized under the single account been authorized under a separate DISH Network account. IN THE EVENT THAT RETAILER BREACHES ANY OF ITS OBLIGATIONS UNDER THIS SECTION 3.6, ECHOSTAR SHALL BE ENTITLED TO CHARGE BACK AT ANY TIME (EVEN AFTER THE TERMINATION OR EXPIRATION OF THIS AGREEMENT) THE INCENTIVES, IF ANY, PAID TO RETAILER BY ECHOSTAR WITH RESPECT TO ANY SUBSCRIBER ACCOUNT AFFECTED BY SUCH BREACH OR DEFAULT. IN THE EVENT RETAILER WISHES TO DISPUTE ANY SUCH CHARGEBACK, RETAILER SHALL FOLLOW THE DISPUTE RESOLUTION PROCEDURES SET FORTH IN SECTION 15 BELOW. ECHOSTAR'S CALCULATION OF AMOUNTS OWING TO ECHOSTAR FROM RETAILER UNDER THIS SECTION 3.6 SHALL BE BINDING ABSENT FRAUD, MALICE OR WILLFUL AND WANTON MISCONDUCT ON THE PART OF ECHOSTAR. The foregoing provisions of this Section 3.6 are without prejudice to any other rights and remedies that EchoStar and/or its Affiliates may have under this Agreement, at law, in equity or otherwise (all of which are hereby expressly reserved), and shall survive expiration or termination of this agreement for any reason whatsoever indefinitely (even if termination is due to a default or breach by EchoStar).

3.7 Pre-Activations. Retailer shall not directly or indirectly activate (a "Pre-activation") any DISH DBS System or DISH DBS receiver prior to installation of such DISH DBS System and/or receiver at a Residential Location.

3.8 Financing, Making Payments on Behalf of End-Users. Retailer shall not directly or indirectly provide financing for the purchase of any Programming or make any payment to EchoStar for Programming services or otherwise on behalf of any retail end-user of a DISH DBS System.

3.9 Installation Services. Retailer represents, warrants, covenants and agrees that all installation and after-sales services (collectively, "Services") performed by Retailer in connection with the sale or lease of DISH DBS Systems will be performed by Retailer in accordance with all applicable laws, codes and regulations, and subject to all of the terms, conditions, standards and guidelines set forth in the DISH Network Installation Manual (located on the retailer web site), as such terms, conditions, standards and specifications may be changed at any time and for any reason by DISH Network Service L.L.C. in its sole discretion, upon notice to Retailer.

3.10 Prior Retailer Agreement. IN THE EVENT THAT RETAILER PREVIOUSLY ENTERED INTO ANY AGREEMENT WITH ECHOSTAR RELATING TO THE MARKETING, PROMOTION, ADVERTISING OR SOLICITATION OF ORDERS FOR PROGRAMMING BY RETAILER AND THE PAYMENT OF CERTAIN AMOUNTS BY ECHOSTAR THEREFOR (A "PRIOR RETAILER AGREEMENT"), WHICH IS IN EFFECT (IN WHOLE OR IN PART) AS OF THE EFFECTIVE DATE OF THIS AGREEMENT, THEN UPON EXECUTION OF THIS AGREEMENT BY RETAILER AND ECHOSTAR: (I) THE PRIOR RETAILER AGREEMENT SHALL BE AUTOMATICALLY TERMINATED, EXCEPT THAT THE PROVISIONS (EXCLUDING ANY PROVISIONS RELATED TO THE PAYMENT OF COMMISSIONS OR INCENTIVES) IN THE PRIOR RETAILER

AGREEMENT WHICH EXPRESSLY SURVIVE, AND SUCH OTHER RIGHTS AND OBLIGATIONS THEREUNDER AS WOULD LOGICALLY BE EXPECTED TO SURVIVE TERMINATION OR EXPIRATION SHALL CONTINUE IN FULL FORCE AND EFFECT; AND (II) ALL COMMISSIONS OR OTHER PAYMENTS OF ANY TYPE DUE TO RETAILER UNDER THE PRIOR RETAILER AGREEMENT SHALL BE PAYABLE BY ECHOSTAR TO RETAILER AS INCENTIVES SOLELY IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT; AND (III) ALL RIGHTS AND OBLIGATIONS BETWEEN THE PARTIES SHALL BE GOVERNED BY THE TERMS AND CONDITIONS OF THIS AGREEMENT, AND THE PRIOR RETAILER AGREEMENT SHALL BE OF NO FORCE OR EFFECT. IN FURTHERANCE OF, AND NOT IN LIMITATION OF, THE FOREGOING, ANY DISPUTE WHICH MAY HAVE ARISEN UNDER THE PRIOR RETAILER AGREEMENT SHALL BE RESOLVED IN ACCORDANCE WITH SECTION 15 BELOW. IN ACCORDANCE WITH SECTION 15.1, RETAILER SHALL HAVE NINETY (90) DAYS (OR THE SHORTEST PERIOD ALLOWED BY LAW IF MORE THAN 90 DAYS) FROM THE DATE OF THIS AGREEMENT TO NOTIFY ECHOSTAR OF ANY CLAIM THAT IT MAY HAVE AGAINST ECHOSTAR UNDER THE PRIOR RETAILER AGREEMENT. HOWEVER, NOTWITHSTANDING ANY TERMS OF THIS AGREEMENT, NOTHING CONTAINED IN THIS AGREEMENT WILL WAIVE ANY RIGHT RETAILER MAY HAVE IN THE CLAIMS BROUGHT IN THE FOLLOWING CLASS ACTION LAWSUITS IN THE EVENT THE FOLLOWING LAWSUITS ARE CERTIFIED: Case No. 00-CV-1989; Styled *John DeJong, d/b/a ANexwave, 9 and Joe Kelly, d/b/a AKel-tronics, 9 and Jaguar Technologies, Inc. v. EchoStar Satellite Corporation*, United States District Court, District of Colorado; Case No. 00-CV-3130, Styled *Air Communication & Satellite, Inc. et al. v. EchoStar Satellite Corporation*, In the District Court, Arapahoe County, Colorado; Case No. 500-CV-268, Styled *Satellite Dealers Supply, Inc. v. EchoStar Communications Corp.*, United States District Court, Eastern District of Texas. In the event that no Prior Retailer Agreement is in effect as of the effective date of this Agreement, Retailer shall only be eligible to receive Incentives for new Subscriber Accounts activated after the date of this Agreement, notwithstanding payment by EchoStar of any commissions to Retailer prior to the date of this Agreement. This Agreement shall not amend, modify, alter or change any terms or conditions of any Lease Plan Dealer Agreement, or any similar agreement relating to leasing, which is now existing or later made with EchoStar or any of its Affiliates.

4. **PROGRAMMING**

4.1. Programming. EchoStar shall determine, in its sole discretion for any reason, the Programming for which Retailer may solicit orders. EchoStar may expand, reduce or otherwise modify the content of any Programming packages or add or delete any Programming (either in a package or a-la-carte) at any time and for any reason in its sole discretion. Any changes shall be effective immediately upon notification by EchoStar, unless EchoStar notifies Retailer of a different effective date.

4.2 Changes. If at any time or for any reason EchoStar changes the content of any Programming package, Retailer's authority to solicit orders for the prior Programming package shall immediately cease.

5. **PRICES.** EchoStar shall determine the retail prices for Programming in its sole discretion. Retailer will only solicit orders for Programming at the retail prices set by EchoStar from time to time. EchoStar may increase, decrease or otherwise modify those prices at any time and for any reason in its sole discretion. Any price changes shall be effective immediately upon notification by EchoStar, unless EchoStar notifies Retailer of a different effective date. Retailer shall not represent that Programming may be purchased or obtained on any other terms except as authorized in writing by EchoStar.

6. **INCENTIVES.**

6.1 Monthly Incentives.

6.1.1 Definition; Terms. Subject to the terms and conditions of this Agreement and any applicable Business Rules, for each DISH DBS System or Promotional Certificate that during the Term of this Agreement: (i) is sold to Retailer by EchoStar or any of its Affiliates, or a Third Party Manufacturer; and (ii) is re-sold by such Retailer directly to a Qualifying Residential Subscriber; and (iii) results in the activation of Eligible Programming for a new Subscriber Account, Retailer may be eligible to receive a monthly incentive (the "Monthly Incentive"). The amount of such Monthly Incentive together with payment terms and other applicable terms and conditions shall be set forth in Business Rules which shall be distributed by EchoStar from time to time in accordance with Section 2.2, above. EchoStar in its sole discretion shall determine whether a particular EchoStar Subscriber is a new Subscriber Account eligible for the payment of Incentives hereunder. ECHOSTAR'S CALCULATION AND PAYMENT OF MONTHLY INCENTIVES SHALL BE PRESUMED CONCLUSIVELY AND IRREBUTABLY CORRECT ABSENT A TIMELY NOTICE OF CLAIM BY RETAILER PURSUANT TO SECTION 15.1.

6.1.2 Charge Back on Monthly Incentives. IN THE EVENT THAT RETAILER IS PAID A MONTHLY INCENTIVE TO WHICH IT IS NOT ENTITLED PURSUANT TO THE TERMS AND CONDITIONS OF THIS AGREEMENT OR ANY PROMOTIONAL PROGRAM OR APPLICABLE BUSINESS RULES, ECHOSTAR SHALL HAVE THE RIGHT TO CHARGE BACK SUCH MONTHLY INCENTIVE PAID TO RETAILER. ECHOSTAR'S CALCULATION AND ASSESSMENT OF ANY CHARGEBACK SHALL BE PRESUMED CONCLUSIVELY AND IRREBUTABLY CORRECT ABSENT A TIMELY NOTICE OF CLAIM BY RETAILER PURSUANT TO SECTION 15.1. ECHOSTAR'S DETERMINATION THAT A CHARGE BACK IS PROPER, SHALL BE CONTROLLING, ABSENT FRAUD, MALICE OR WANTON AND WILLFUL MISCONDUCT ON THE

PART OF ECHOSTAR. THE PROVISIONS OF THIS SECTION 6.1.2 SHALL SURVIVE EXPIRATION OR TERMINATION OF THIS AGREEMENT INDEFINITELY (EVEN IF TERMINATION IS DUE TO A DEFAULT OR BREACH BY ECHOSTAR).

6.2 **Additional Incentives.**

6.2.1 **Definition; Terms.** During the Term of this Agreement, Retailer may be eligible to participate in and receive incentives other than Monthly Incentives including, but not limited to, activation fee payments, flex payments, equipment discounts, and free professional installation payments ("Additional Incentives") under such Promotional Programs as EchoStar may make available to Retailer in its sole discretion from time to time. The terms and conditions, including without limitation, eligibility requirements, governing each Additional Incentive shall be set forth in Business Rules which shall be distributed or otherwise made available by EchoStar from time to time in accordance with Section 2.2 above. RETAILER ACKNOWLEDGES AND AGREES THAT: (I) UNDER NO CIRCUMSTANCES SHALL ECHOSTAR HAVE AT ANY TIME ANY OBLIGATION TO OFFER ADDITIONAL INCENTIVES TO RETAILER, OR IF ADDITIONAL INCENTIVES ARE OFFERED TO OTHERS, TO ALTER OR AMEND THE BUSINESS RULES TO PERMIT RETAILER TO BE ELIGIBLE TO RECEIVE THEM; (II) IF ECHOSTAR OFFERS ANY ADDITIONAL INCENTIVES TO RETAILER THROUGH ANY PROMOTIONAL PROGRAM, RETAILER SHALL ONLY BE ELIGIBLE TO RECEIVE THE ADDITIONAL INCENTIVES IF AND TO THE EXTENT THAT IT MEETS ALL OF THE QUALIFICATION CRITERIA AND OTHER TERMS AND CONDITIONS SET FORTH IN THE APPLICABLE BUSINESS RULES AND THIS AGREEMENT; (III) UNLESS EXPRESSLY SET FORTH TO THE CONTRARY UNDER THE TERMS AND CONDITIONS OF THE RELEVANT PROMOTIONAL PROGRAM, ADDITIONAL INCENTIVES SHALL ONLY BE PAID TO RETAILER WITH RESPECT TO DISH DBS SYSTEMS OR PROMOTIONAL CERTIFICATES THAT: (A) ARE SOLD TO RETAILER BY ECHOSTAR OR ANY OF ITS AFFILIATES, OR A THIRD PARTY MANUFACTURER; (B) ARE RE-SOLD BY SUCH RETAILER DIRECTLY TO A QUALIFYING RESIDENTIAL SUBSCRIBER; AND (C) RESULT IN THE ACTIVATION OF ELIGIBLE PROGRAMMING FOR A NEW SUBSCRIBER ACCOUNT. ECHOSTAR IN ITS SOLE DISCRETION SHALL DETERMINE WHETHER A PARTICULAR ECHOSTAR SUBSCRIBER IS A NEW SUBSCRIBER ACCOUNT ELIGIBLE FOR THE PAYMENT OF INCENTIVES HEREUNDER. RETAILER ACKNOWLEDGES AND AGREES THAT IF IT CHOOSES TO PARTICIPATE IN ANY PROMOTIONAL PROGRAM IT WILL CAREFULLY REVIEW AND ADHERE TO ALL THE TERMS AND CONDITIONS SET FORTH IN THE BUSINESS RULES RELATED THERETO. FURTHERMORE, RETAILER'S PARTICIPATION IN ANY PROMOTIONAL PROGRAM OR RECEIPT OF ADDITIONAL INCENTIVES THEREUNDER SHALL SERVE AS RETAILER'S ACKNOWLEDGEMENT OF THE TERMS AND CONDITIONS SET FORTH IN THE RELEVANT BUSINESS RULES AND RETAILER'S AGREEMENT TO BE BOUND THERETO. ECHOSTAR'S CALCULATION AND PAYMENT OF ADDITIONAL INCENTIVES SHALL BE PRESUMED CONCLUSIVELY AND IRREBUTABLY CORRECT ABSENT A TIMELY NOTICE OF CLAIM BY RETAILER PURSUANT TO SECTION 15.1.

6.2.2 **Charge Backs on Additional Incentives.** IN THE EVENT THAT RETAILER IS PAID AN ADDITIONAL INCENTIVE TO WHICH IT IS NOT ENTITLED PURSUANT TO THE TERMS AND CONDITIONS OF THIS AGREEMENT OR ANY PROMOTIONAL PROGRAM OR APPLICABLE BUSINESS RULES, ECHOSTAR SHALL HAVE THE RIGHT TO CHARGE BACK SUCH ADDITIONAL INCENTIVE PAID TO RETAILER. ECHOSTAR'S CALCULATION AND ASSESSMENT OF ANY CHARGEBACK SHALL BE PRESUMED CONCLUSIVELY AND IRREBUTABLY CORRECT ABSENT A TIMELY NOTICE OF CLAIM BY RETAILER PURSUANT TO SECTION 15.1. ECHOSTAR'S DETERMINATION THAT A CHARGE BACK IS PROPER, SHALL BE CONTROLLING, ABSENT FRAUD, MALICE OR WANTON AND WILLFUL MISCONDUCT ON THE PART OF ECHOSTAR. THE PROVISIONS OF THIS SECTION 6.2.2 SHALL SURVIVE EXPIRATION OR TERMINATION OF THIS AGREEMENT INDEFINITELY (EVEN IF TERMINATION IS DUE TO A DEFAULT OR BREACH BY ECHOSTAR).

6.3 **Payment by EFT.** Subject to the terms of this Section, all Incentives paid to Retailer hereunder shall be made by EFT.

6.3.1 **Electronic Funds Transfer.** Until Retailer provides EchoStar with the Retailer Account information in the manner prescribed by EchoStar ("EFT Instructions"), or in the event that Retailer elects to receive payments by check, EchoStar shall pay Incentives to Retailer by check and Retailer will be assessed EchoStar's standard processing fee, which may be changed by EchoStar at any time and for any reason in its sole discretion upon notice to Retailer. For a period of approximately thirty (30) days after EchoStar receives initial EFT Instructions from Retailer, EchoStar will make all payments of Incentives to Retailer hereunder by check, and mail the same free of charge.

6.3.2 **Reliance on Retailer Account Information.** With respect to Retailer's EFT Instructions, and any purported changes or modifications thereof by Retailer, EchoStar may act in reliance upon any writing or instrument or signature which it, in good faith, believes to be genuine, and may assume the validity and accuracy of any statement or assertion contained in such writing or instrument and may assume that any person purporting to give any such writing, notice, advice, or instruction in connection with the provisions hereof has been duly authorized by Retailer to do so.

DES

6.3.3 EchoStar EFT Liability Limitation. Retailer agrees that in no event shall EchoStar have any liability under this Agreement for any Incentives not received by Retailer as a result of an error in any way attributable to: (i) any bank or financial institution; (ii) Retailer; or (iii) any other person, entity or circumstance outside of EchoStar's direct control. The provisions of this Section 6.3.3 shall survive expiration or termination of this Agreement, for any reason whatsoever, indefinitely (even if termination is due to a default or breach by EchoStar).

6.4 Statements. EchoStar shall make available to Retailer, in an electronic format determined by EchoStar in its sole discretion, periodic statements reflecting the Monthly Incentives and Additional Incentives (if any) payable to Retailer as well as any chargebacks assessed against Retailer. Retailer acknowledges that EchoStar is not required to provide Retailer with any additional information, including but not limited to communications between EchoStar and any EchoStar Subscriber or any Subscriber Account information.

6.5 Exceptions. Notwithstanding anything to the contrary set forth herein:

6.5.1 Retailer shall not be entitled to either Monthly Incentives (at anytime) or Additional Incentives (to the extent the relevant chargeback period set forth in the Business Rules has not expired) with respect to any Subscriber Account for which: (i) the Eligible Programming has been cancelled by anyone; (ii) payment in full for the Eligible Programming has not been timely received by EchoStar in accordance with the terms and conditions of the then current EchoStar Residential Customer Agreement; (iii) a credit or refund has been issued by EchoStar for any reason (EchoStar shall have the discretion to issue a credit or refund in its sole judgment); (iv) the subscriber would otherwise be a Qualifying Residential Subscriber, but is already receiving—or previously received at any time—any of the Programming, or any other audio, video, data or other programming services from EchoStar or any of its Affiliates on the date of the order; (v) the Subscriber Account is otherwise terminated, disconnected or deactivated for any reason, without limitation; or (vi) the Qualifying Residential Subscriber alleges that Retailer committed fraud or any other deceptive act or practice.

6.5.2 Retailer shall not be entitled to any Incentives with respect to the activation by EchoStar of a DISH DBS System, unless all of the individual components comprising the relevant DISH DBS Systems (i.e., receivers, dishes and LNBFs) are confirmed by EchoStar as having been purchased by Retailer directly from either (i) Echosphere L.L.C. or other Affiliate of EchoStar; or (ii) a Third Party Manufacturer, or the DISH DBS System is delivered pursuant to a Promotional Certificate that is confirmed by EchoStar as having been purchased by Retailer directly from either (i) Echosphere L.L.C. or other Affiliate of EchoStar; or (ii) a Third Party Manufacturer. Retailer acknowledges and agrees that EchoStar shall not be required to pay Incentives to Retailer in connection with a Promotional Certificate or DISH DBS System purchased by Retailer directly from a Third party Manufacturer, unless and until the Third Party Manufacturer provides EchoStar with accurate information required by EchoStar to be able to pay such Incentives to Retailer including, at a minimum: (a) the serial number of the Promotional Certificate or DISH DBS System sold by the Third Party Manufacturer to Retailer; and (b) the name and address, and other appropriate identifying information of Retailer.

6.6 Suspension and Termination of Incentives.

6.6.1 Suspension. In addition to any other rights and remedies available, EchoStar shall not be required to pay any Incentives to Retailer which would otherwise be due to Retailer during any period in which Retailer is in breach or default of this Agreement, the Trademark License Agreement (Attachment A) or any Other Agreement (as defined in Section 6.8 below), and EchoStar shall have no liability to Retailer as a result of such suspension of payment. Specifically, and without limitation of the foregoing, Retailer shall have no right at any time to recoup any Incentives not paid during a period of breach or default. The foregoing provisions of this Section 6.6.1 may be exercised without terminating this Agreement and are without prejudice to any other rights and remedies that EchoStar and/or its Affiliates may have under this Agreement, at law, in equity or otherwise. The provisions of this Section 6.6.1 shall survive expiration or termination of this Agreement, for any reason whatsoever, indefinitely (even if termination is due to a default or breach by EchoStar).

6.6.2 Termination. In the event this Agreement or any Other Agreement (as defined in Section 6.8, below) expires or is terminated for any reason whatsoever, EchoStar shall have the right, in addition to any other rights and remedies it may have, to terminate immediately all payments of Incentives then presently due and owing, or thereafter due, to Retailer under this Agreement.

6.7 Non-Incentivized Activations by EchoStar. In the event that Retailer for any reason does not qualify for an Incentive with respect to any Qualifying Residential Subscriber or any DISH DBS System, EchoStar shall be entitled to activate Programming for that Qualifying Residential Subscriber without payment of any Incentive to Retailer, even if Retailer solicited the Qualifying Residential Subscriber to order Programming from EchoStar.

6.8 Offsets. In no event shall Retailer offset any Programming payment which might be collected by Retailer, or any other amounts due to EchoStar or any of its Affiliates from Retailer for any reason, against any Incentives owed to Retailer by EchoStar or any other sums owed to Retailer by EchoStar or any of its Affiliates. In the event that the Incentives paid by EchoStar to Retailer exceed the amount to which Retailer was entitled, or if Retailer is indebted to EchoStar or its Affiliates under Section 13 below or for any

BS

other reason, Retailer acknowledges and agrees that EchoStar and its Affiliates shall have the right, but not the obligation, to offset any such amounts due to EchoStar or its Affiliates from Retailer for any reason against any Incentives or other money otherwise due to Retailer from EchoStar or any of its Affiliates. Further, should one or more contracts now or hereafter exist between EchoStar and/or an Affiliate of EchoStar on the one hand and Retailer and/or an Affiliate of Retailer on the other hand, or if EchoStar or any such Affiliate is holding funds or equipment to be paid or disbursed to Retailer pursuant to business dealings between the parties not reflected in any contract (all such other contracts and business dealings with EchoStar and/or any Affiliate are herein collectively referred to as the "Other Agreements"), EchoStar or such Affiliate may, but shall have no obligation to, deduct from any amounts due or to become due to Retailer under this Agreement any sums which Retailer owes to EchoStar or such Affiliate, whether or not then due arising out of this Agreement or the Other Agreements, as well as any and all amounts for which EchoStar or such Affiliate may become liable to third parties by reason of Retailer's acts in performing, or failing to perform, Retailer's obligations under this Agreement or any of the Other Agreements. Further, EchoStar may, but shall have no obligation to, withhold such sums from any monies due or to become due to Retailer hereunder as EchoStar, in its sole discretion and for any reason, deems necessary to protect EchoStar or any Affiliate from any loss, damage, or expense relating to or arising out of Retailer's actions or performance hereunder, or in response to any claim or threatened claim of which EchoStar becomes aware concerning Retailer or the performance of Retailer's duties hereunder. EchoStar's right to money due and to become due hereunder shall not be subject to any defense (except payment), offset, counterclaim, or recoupment of Retailer whatsoever, including, but not limited to, any which might arise from a breach of this Agreement by EchoStar or any of its Affiliates. The provisions of this Section 6.8 shall survive expiration or termination of this Agreement, for any reason whatsoever, indefinitely (even if termination is due to a default or breach by EchoStar).

6.9 <u>Collection of Programming Fees</u>. Retailer acknowledges and agrees that, except for the installation of DISH DBS Systems which may be provided by Retailer, under no circumstances shall Retailer collect any payment for Programming or any other money due to EchoStar and/or any of EchoStar's Affiliates directly from any EchoStar Subscriber or other person, and all Programming fees will be billed directly to EchoStar Subscribers by EchoStar. In the event that, notwithstanding Retailer's best efforts to comply with this requirement, any EchoStar Subscriber or other person forwards any payment to Retailer rather than to EchoStar directly, Retailer shall immediately forward the payment, together with any applicable sales or similar taxes, to EchoStar without deduction or offset of any kind, and shall instruct the EchoStar Subscriber or other person that all future payments for Programming must be made to EchoStar directly.

6.10 <u>Sole Incentives</u>. Retailer acknowledges and agrees that the Incentives payable pursuant to this Agreement and any applicable Business Rules constitute the sole amounts payable by EchoStar to Retailer in connection with this Agreement.

6.11 <u>No Admission</u>. No payment to Retailer under this Agreement, whether in full or in part, shall be deemed to operate as EchoStar's acceptance, waiver or admission that Retailer has complied with any provision of this Agreement or the requirements of any Promotional Program including, without limitation, any Business Rules related thereto. The parties agree that at all times (including but not limited to in any arbitration or court proceeding) it shall remain Retailer's burden to prove eligibility for receipt of any Incentive (including, without limitation, performance of any conditions precedent thereto) or that any chargeback was incorrect.

6.12 <u>Acknowledgement</u>. Retailer hereby acknowledges and agrees that the Incentives paid to Retailer under this Agreement do not represent deferred compensation in any form whatsoever and are not being paid to Retailer with respect to the procurement of EchoStar Subscribers or the activation of EchoStar Subscriber Accounts, but rather are being paid to Retailer as an incentive to market, promote, and solicit orders for Programming from future subscribers and to provide continuing service to subscribers after initial activation.

6.13 <u>Assignment of Right to Payment</u>. Retailer does not have the power or the right to assign any payments, or its right to receive any payments, that may be due to Retailer under this Agreement. Any such assignment (whether express or by operation of law) shall be void and unenforceable. Any such attempted assignment shall immediately discontinue Retailer's right to future payments under this Agreement.

7. <u>ORDERS</u>.

7.1 Retailer agrees to use its reasonable commercial efforts to promote and enhance EchoStar's business, reputation and goodwill. Retailer shall not use any independent contractors, Affiliates or sub-agents to fulfill its obligations hereunder without EchoStar's specific prior written consent, which consent may be withheld in EchoStar's sole judgment for any reason whatsoever. In the event EchoStar does grant consent to Retailer to use persons not employed by Retailer to perform activities contemplated hereunder, Retailer shall be responsible for the acts and omissions of such persons under this Agreement to the same extent it is responsible for the acts and omissions of its own employees.

7.2 Retailer shall not sell Programming under any circumstances. All sales of Programming are transactions solely between EchoStar and EchoStar Subscribers. Retailer shall promptly forward to EchoStar all orders for Programming in the manner prescribed by EchoStar from time to time. Retailer understands that EchoStar shall have the right, in its sole discretion and for any reason, to accept or reject, in whole or in part, all orders for the Programming. Retailer also agrees that it shall not condition, tie or

otherwise bundle any purchase of Programming with the purchase of other services or products other than as specifically agreed to in writing by EchoStar in advance.

7.3 Retailer shall comply with each Business Rule, including without limitation all Business Rules which govern or are applicable to any Promotional Program in which Retailer elects to participate. Retailer shall disclose to each prospective EchoStar Subscriber the terms as are relevant to the Promotional Program in which the prospective EchoStar Subscriber is interested as well as any other terms as set forth in any applicable Business Rule. Furthermore, Retailer shall take all actions and refrain from taking any action, as reasonably requested by EchoStar in connection with the marketing, advertisement, promotion and/or solicitation of orders for Programming and sale of equipment and Retailer shall cooperate by supplying EchoStar with information relating to those actions as EchoStar reasonably requests. Failure to adhere to any Business Rules may result in disciplinary action up to and including termination and any other remedy provided in this Agreement.

7.4 Retailer hereby acknowledges and agrees that the relationship, contractual or otherwise, between EchoStar (and/or any of its Affiliates) and any consumer that purchases Programming services or other products and services from EchoStar and/or any of its Affiliates (an "EchoStar Subscriber") is, as between EchoStar and Retailer, for the sole and exclusive benefit of EchoStar and that EchoStar may conduct such relationship in any manner that it sees fit, in its sole discretion for any reason, without incurring any liability to Retailer. In furtherance (but not limitation) of the foregoing, Retailer acknowledges and agrees that Retailer is a not a third-party beneficiary of any agreement that EchoStar or any of its Affiliates may have with any EchoStar Subscriber, and that, under no circumstances, shall Retailer have any claim or cause of action against EchoStar or any Affiliate of EchoStar for any action taken by EchoStar and/or any of its Affiliates with regard to any EchoStar Subscriber. Retailer further acknowledges and agrees that all records created or maintained by, or on behalf of, EchoStar relating to any EchoStar Subscriber are the sole and exclusive property of EchoStar and EchoStar shall not have any obligation whatsoever to give or allow Retailer access to such information, even if authorized or requested by such EchoStar Subscriber. The provisions of this Section 7.4 shall survive expiration or termination of this Agreement for any reason whatsoever indefinitely (even if termination is due to a default or breach by EchoStar).

8. <u>TRADEMARK LICENSE AGREEMENT.</u> Retailer shall sign the Trademark License Agreement, in the form attached as Attachment A hereto, which agreement is hereby incorporated by reference in its entirety.

9. <u>CONDUCT OF BUSINESS.</u>

9.1 <u>Compliance with Laws.</u> Retailer shall comply with all applicable governmental statutes, laws, rules, regulations, ordinances, codes, directives, and orders (whether federal, state, municipal, or otherwise) and all amendments thereto, now enacted or hereafter promulgated, in force during the Term (hereinafter "Laws"), and Retailer is solely responsible for its compliance with all Laws which apply to its obligations under this Agreement.

9.2 <u>Signal Theft.</u> Retailer shall not directly or indirectly: (i) engage in any signal theft, piracy or similar activities; (ii) engage in any unauthorized reception, transmission, publication, use, display or similar activities with respect to Programming; (iii) use a single DISH Network account for the purpose of authorizing Programming for multiple DISH DBS Systems that are not all located in the same Residential Location and connected to the same phone line; (iv) alter any DISH DBS Systems or "Smart Cards", or any other equipment compatible with programming delivered by EchoStar or any of its Affiliates to be capable of signal theft (or for any other reason without the express written consent of EchoStar); (v) manufacture, import, offer to the public, sell provide or otherwise traffic in any technology, product, service, or device which is primarily designed or produced for the purpose of, or is marketed for use in, or has a limited commercially significant purpose other than, assisting in or facilitating signal theft or other piracy; or (vi) aid any others in engaging in, or attempting to engage in, any of the above described activities. Retailer shall immediately notify EchoStar if it becomes aware of any such activity by any person or entity.

9.3 <u>Hardware and Programming Export and Sale Restrictions.</u> In addition to, and not in limitation of, the Territory restrictions contained in this Agreement, Retailer hereby acknowledges that the U.S. Department of State and/or the U.S. Department of Commerce may in the future assert jurisdiction over DISH DBS Systems, and that DISH DBS Systems and Programming may not currently be sold outside of the Territory. Retailer represents and warrants that it will not directly or indirectly arrange for or participate in the export or sale of DISH DBS Systems or Programming, in whole or in part, outside of the Territory, and agrees that Retailer will take all reasonable and adequate steps to prevent the export or sale of DISH DBS Systems and Programming outside of the Territory by others who purchase from Retailer and who might reasonably be expected to export or sell them outside the Territory.

9.4 <u>Bounty Programs; Subscriber Information.</u> Retailer acknowledges that it is in the best interest of both EchoStar and Retailer for EchoStar Subscribers to be long-term customers of EchoStar and/or its Affiliates. Retailer acknowledges that churning of EchoStar Subscribers is detrimental to EchoStar and negatively affects EchoStar's ability to offer Monthly Incentives and/or Additional Incentives. Retailer acknowledges that for any Promotional Program to be viable, EchoStar Subscribers must be long-term subscribers to DISH Network. Therefore, Retailer agrees that, during the Term and for a period of five (5) years following the expiration or termination thereof for any reason whatsoever, Retailer and its Affiliates will not directly or indirectly operate, offer to any other person or entity, participate in, or assist any other person or entity to participate in, any promotion or program offered by any person or entity other than EchoStar or any of its Affiliates which provides for the delivery of an economic incentive or other benefit to Retailer, an

DEL

EchoStar Subscriber or any third party that is tied or connected to the solicitation of existing EchoStar Subscribers to cancel their EchoStar service and/or switch to a service offered by any other multi-channel video programming service provider (hereinafter a "Bounty Program"). Furthermore, Retailer agrees that, during the Term and for a period of five (5) years following the expiration or termination thereof for any reason whatsoever, Retailer and its Affiliates will not directly or indirectly produce, place, display or use any advertising or marketing material that explicitly references DISH Network, EchoStar, an Affiliate of EchoStar or EchoStar Subscribers and attempts to persuade EchoStar Subscribers to cancel their EchoStar service and/or switch to a service offered by any other multi-channel video programming service provider. In addition to and without limitation of the foregoing, Retailer acknowledges and agrees that the names, addresses and other identifying information of EchoStar Subscribers ("Subscriber Information") are proprietary to EchoStar and that Subscriber Information shall be treated with the highest degree of confidentiality by Retailer. During the Term and a period of five (5) years following the expiration or termination of this Agreement, Retailer will not, without the express prior written consent of EchoStar, which EchoStar may withhold in its sole discretion and for any reason, directly or indirectly: (i) make use of any list of past or current EchoStar Subscribers (whether developed by Retailer, obtained from EchoStar or obtained from any other source); (ii) use any Subscriber Information for the direct or indirect benefit of any individual or entity, other than EchoStar; or (iii) reveal any Subscriber Information to any third party for any reason, provided, however, that nothing herein shall prohibit Retailer from utilizing its own list of persons who have purchased any products or services from Retailer (but not a discrete portion thereof identifying only EchoStar Subscribers) for its general business operations if such operations are unrelated to the delivery of audio, video or data programming services or the provision of the hardware necessary to receive such services. Nothing in this Agreement shall preclude Retailer from receiving payments from another multi-channel video programming service provider in connection with the sale of that service provider's programming services to consumers who are not EchoStar Subscribers. The provisions of this Section 9.4 shall survive expiration or termination of this Agreement, for any reason whatsoever, for five (5) years (even if termination is due to a default or breach by EchoStar).

9.5 <u>Remedies</u>. Retailer agrees that any breach of its obligations set forth in this Section 9 will cause substantial and irreparable harm and injury to EchoStar for which monetary damages alone would be an inadequate remedy, and which damages are difficult to accurately measure. Accordingly, Retailer agrees that EchoStar shall have the right, in addition to any other remedies available, to obtain immediate injunctive relief (without the necessity of posting or filing a bond or other security) to restrain the threatened or actual violation hereof by Retailer, its employees or agents, as well as other equitable relief allowed by the federal and state courts. The provisions of this Section shall survive expiration or termination of this Agreement indefinitely (even if termination is due to a default or breach by EchoStar).

9.6 <u>Economic Benefits Derived Held in Trust</u>. In the event that Retailer derives an economic benefit, in any form, from a violation of its obligations under this Section 9, it is hereby agreed that such economic benefit is the property of EchoStar and that Retailer shall deliver the cash value of the economic benefit to EchoStar immediately upon receipt of the economic benefit. It is further agreed that Retailer shall hold such economic benefit in trust for the benefit of EchoStar until such time as its cash value is delivered to EchoStar. The foregoing is agreed to without prejudice to EchoStar to exercise any other rights and remedies it may have, including without limitation, the right to terminate this Agreement and seek damages or other legal or equitable relief. The provisions of this Section shall survive expiration or termination of this Agreement indefinitely (even if termination is due to a default or breach by EchoStar).

9.7 <u>Sales and Use Tax</u>. Any transactions between Retailer and consumers for the purchase of DISH DBS Systems and related equipment are transactions entered into solely and exclusively between Retailer and the consumer. Although EchoStar may from time to time incentivize Retailer to offer consumers free or discounted DISH DBS Systems and related equipment, EchoStar does not acquire or retain title in such DISH DBS Systems and related equipment. Retailer, and not EchoStar, is solely responsible for Retailer's investigation of and compliance with all Laws concerning sales and use taxes applicable to any equipment transactions between Retailer and consumers.

10. <u>TERM AND TERMINATION</u>.

10.1 <u>Term</u>. This Agreement shall commence on the date of execution by both parties and shall continue until December 31, 2004 (the "Term") unless earlier terminated by either party in accordance with the terms and conditions of this Agreement. This Agreement is not automatically renewable and neither party hereto shall be under any obligation whatsoever to offer or to accept an agreement to renew or replace this Agreement upon its expiration. RETAILER RECOGNIZES THAT THIS AGREEMENT MAY BE TERMINATED PRIOR TO THE EXPIRATION OF THE TERM AND THAT NO REPRESENTATIONS HAVE BEEN MADE TO RETAILER THAT RETAILER WILL REMAIN AN AUTHORIZED RETAILER DURING THE ENTIRE TERM OR THAT THE AGREEMENT WILL NOT BE TERMINATED PRIOR TO EXPIRATION OF THE TERM PURSUANT TO SECTIONS 10.2, 10.3, 10.4 OR 10.5 BELOW.

10.2 <u>Termination by Either Party Without Cause</u>. Either party may, in its sole discretion, terminate this Agreement for its convenience (without cause) by giving the other party no less than sixty (60) days prior written notice, except that EchoStar may not terminate Retailer without cause pursuant to this Section 10.2 during the first twelve calendar months of this Agreement if immediately prior to executing this Agreement, Retailer was an Authorized Retailer in good standing and not in breach or default under a Prior Retailer Agreement. EchoStar acknowledges and agrees that Retailer may choose to sell products or programming which compete

DEL



I:\ra\INCENTIVIZED LLC 013004.doc

with EchoStar products, programming or services and that EchoStar cannot require Retailer to continue as an Authorized Retailer. Retailer acknowledges and agrees that it cannot require that EchoStar allow Retailer to remain an Authorized Retailer regardless of whether or not any other retailer is allowed to remain an Authorized Retailer.

10.3 Termination By Either Party Upon Default. This Agreement may be terminated by a party (the "Affected Party"), if the other party (the "Other Party") has failed to cure any Default (as defined below) within twenty (20) days of receipt of a written notice of such Default from the Affected Party. For the purposes of this Agreement a Default shall occur when the Other Party: (i) fails to pay any amount to either party or its Affiliates when due; (ii) fails to perform any obligation or breaches any representation, warranty or covenant in this Agreement, or the Trademark License Agreement (Attachment A) (regardless of whether breach or default of such obligation, representation, warranty or covenant is designated as giving rise to a termination right); (iii) becomes insolvent, or voluntary or involuntary bankruptcy, insolvency or similar proceedings are instituted against it; (iv) fails to maintain operations as a going business; (v) ceases to continuously and actively market and promote Programming; (vi) makes any representation or promise on behalf of the Affected Party inconsistent with the representations or promises that the Affected Party has specifically authorized.

10.4 Automatic Termination. This Agreement shall terminate automatically should any of the following occur, unless EchoStar notifies Retailer to the contrary in writing: (i) Retailer, or any officer, director, substantial shareholder or principal of the Retailer is convicted in a court of competent jurisdiction of any criminal offenses greater than a Class C Misdemeanor; (ii) Retailer fails to comply with any federal, state or local law or regulation; (iii) Retailer engages in any practice, related to the business conducted by the Retailer in connection with this Agreement, which is determined to be an illegal, deceptive or unfair trade practice in violation of any applicable federal, state or local law or regulation; (iv) Retailer falsifies any records or reports required hereunder or under any Business Rule; (v) the Trademark License Agreement (Attachment A) or any Other Agreement (as defined in Section 6.8 above) terminate for any reason; (vi) any actual or alleged fraud, misrepresentation, or illegal action of any sort by Retailer; (vii) Retailer fraudulently receives, or attempts to receive, an Incentive or payment to which it is not entitled under this or any Other Agreement (as defined in Section 6.8 above); (viii) Retailer fraudulently receives, or attempts to receive, an Incentive or payment by misrepresenting any information concerning a prior EchoStar Subscriber to make that person or entity appear to be a new EchoStar Subscriber; (ix) Retailer fails to activate the applicable minimum number of new subscribers (the "New Subscriber Minimum") set forth in any applicable Business Rules; (x) any of the representations or warranties made by Retailer in this Agreement are false; (xi) Retailer is in breach or default of its obligations under Section 3.6, 3.7, 3.8, 3.9, 6.13, 9.2, 9.3, 9.4, or 9.7; or (xii) pursuant to Section 17.4.

10.5 Termination of Agreement. The parties hereto agree that if this Agreement terminates for any reason: (i) Retailer shall immediately discontinue the marketing, promotion, and solicitation of orders for Programming, and immediately cease to represent and/or imply to any person or entity that Retailer is an Authorized Retailer of EchoStar; (ii) Retailer shall immediately discontinue all use of the trademarks associated or included in any way whatsoever with the Programming, including, without limitation, DISH; (iii) Retailer shall deliver to EchoStar, or destroy, at EchoStar's option, all tangible things of every kind (excluding DISH DBS Systems) in Retailer's possession or control that bear any of the trademarks; (iv) Retailer shall upon request by EchoStar, certify in writing to EchoStar that such delivery or destruction has taken place; and (v) Retailer shall pay all sums due EchoStar under this Agreement, or any Other Agreement, within thirty (30) days of the date of termination.

11. INDEPENDENT CONTRACTOR. The relationship of the parties hereto is that of independent contractors. Retailer shall conduct its business as an independent contractor, and all persons employed in the conduct of such business shall be Retailer's employees only, and not employees or agents of EchoStar or its Affiliates. Retailer shall prominently state its business name, address and phone number in all communications with the public, including, without limitation, marketing materials, flyers, print ads, television or radio spots, web sites, emails, invoices, sales slips, and the like. Notwithstanding anything in this Agreement to the contrary, Retailer (including without limitation its officers, directors, agents and employees) shall not, under any circumstances, hold itself out to the public or represent that it is an agent, employee or Affiliate of EchoStar or any EchoStar Affiliate. In furtherance of (and without limiting) the foregoing, in no event shall Retailer use EchoStar's name or the name of any EchoStar Affiliate in any manner which would tend to imply that Retailer is an Affiliate of EchoStar or that Retailer is an agent or employee of EchoStar or one of its Affiliates or that Retailer is acting or is authorized to act on behalf of EchoStar or one of its Affiliates. This Agreement does not constitute any joint venture or partnership. Retailer represents that it is not dependent on EchoStar for a major part of its business. It is further understood and agreed that Retailer has no right or authority to make any representation, promise or agreement or take any action on behalf of EchoStar or an EchoStar Affiliate.

12. LIMITATION OF LIABILITY. The provisions of this Section 12 shall survive expiration or termination of this Agreement indefinitely (even if termination is due to a default or breach by EchoStar).

12.1 Upon termination of this Agreement for any reason set forth herein, Retailer shall have no right to require EchoStar to continue to allow Retailer to act as an Authorized Retailer to solicit orders on behalf of EchoStar. Retailer agrees that in the event of termination of this Agreement for any reason, no amounts spent in its fulfillment will be recoverable from EchoStar or any of its Affiliates by Retailer.

12.2 IN NO EVENT SHALL PROJECTIONS OR FORECASTS MADE BY EITHER PARTY BE BINDING AS COMMITMENTS OR PROMISES. IN NO EVENT SHALL ECHOSTAR OR ANY AFFILIATE OF ECHOSTAR BE LIABLE FOR

DGI

ANY EXEMPLARY, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES TO RETAILER (WHETHER FORESEEABLE OR NOT), INCLUDING WITHOUT LIMITATION ANY PAYMENT FOR LOST BUSINESS, FUTURE PROFITS, LOSS OF GOODWILL, REIMBURSEMENT FOR EXPENDITURES OR INVESTMENTS MADE OR COMMITMENTS ENTERED INTO, CREATION OF CLIENTELE, ADVERTISING COSTS, TERMINATION OF EMPLOYEES OR EMPLOYEES SALARIES, OVERHEAD OR FACILITIES INCURRED OR ACQUIRED BASED UPON THE BUSINESS DERIVED OR ANTICIPATED UNDER THIS AGREEMENT, CLAIMS UNDER DEALER TERMINATION, PROTECTION, NON-RENEWAL OR SIMILAR LAWS, FOR ANY CAUSE WHATSOEVER WHETHER OR NOT CAUSED BY NEGLIGENCE.

12.3 NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT SHALL THE AGGREGATE LIABILITY OF ECHOSTAR AND ITS AFFILIATES UNDER THIS AGREEMENT EXCEED THE AMOUNT PAID TO RETAILER BY ECHOSTAR UNDER THE TERMS OF THIS AGREEMENT.

13. **INDEMNIFICATION.** Retailer shall indemnify, defend and hold EchoStar and its Affiliates, and its and their respective officers, directors, employees, agents and shareholders, and its and their respective assigns, heirs, successors and legal representatives (collectively the "EchoStar Group") harmless from and against, any and all costs, losses, liabilities, damages, lawsuits, judgments, claims, actions, penalties, fines and expenses (including, without limitation, interest, penalties, reasonable attorneys' fees and all monies paid in the investigation, defense or settlement of any or all of the foregoing) ("Claims"), that arise out of, or are incurred in connection with: (i) Retailer's performance or failure of performance under this Agreement and any direct or indirect results thereof, including but not limited to Retailer's sale and installation of DISH DBS Systems; (ii) Retailer's lawful or unlawful acts or omissions (or those of any of Retailer's employees or agents, whether or not such acts are within the scope of employment of such employees or agents) relating to the sale, marketing, advertisement, promotion or distribution of Programming, Promotional Certificates and/or DISH DBS Systems and related equipment; (iii) the failure of Retailer to comply with any provision of this Agreement or any Business Rule; (iv) the breach of any of Retailer's representations or warranties contained herein; (v) all purchases, contracts, debts and/or obligations made by Retailer; (vi) the failure of Retailer to comply with, or any actual or alleged violation of, any applicable laws, statute, ordinance, governmental administrative order, rule or regulation; (vii) any claim brought by Retailer's employees or agents for compensation and/or damages arising out of the expiration or termination of this Agreement; or (viii) any claim of pirating, infringement or imitation of the logos, trademarks or service marks of programming providers (except with respect to any marketing materials supplied to Retailer by EchoStar). In the event of any claim for indemnification by the EchoStar Group under this Section 13, the EchoStar Group shall be entitled to representation by counsel of its own choosing, at Retailer's sole cost and expense. The EchoStar Group shall have the right to the exclusive conduct of all negotiations, litigation, settlements and other proceedings arising from any such claim and Retailer shall, at its own cost and expense, render all assistance requested by EchoStar in connection with any such negotiation, litigation, settlement or other proceeding. Each indemnity obligation herein shall be in addition to and not in limitation of any other indemnity obligation set forth herein. The provisions of this Section 13 shall survive expiration or termination of this Agreement indefinitely (even if termination is due to a default or breach by EchoStar).

14. **CONFIDENTIALITY.** Except as otherwise set forth in Section 9.4, at all times during the term of this Agreement and for a period of three (3) years thereafter, Retailer and its employees will maintain, in confidence, the terms and provisions of this Agreement, the terms and provisions of any and all Business Rules and Promotional Programs, as well as all data, summaries, reports, communications or information of all kinds, whether oral or written, acquired, devised or developed in any manner from EchoStar's personnel or files, or as a direct or indirect result of Retailer's actions or performance under this Agreement, and Retailer represents that it has not and will not reveal the same to any persons not employed by Retailer, except: (i) at the written direction of EchoStar; (ii) to the extent necessary to comply with law, the valid order of a court of competent jurisdiction or the valid order or requirement of a governmental agency or any successor agency thereto, in which event Retailer shall notify EchoStar of the information in advance, prior to making any disclosure, and shall seek confidential treatment of such information; (iii) as part of its normal reporting or review procedure to its parent company, its auditors and its attorneys, provided such parent company, auditors and attorneys agree to be bound by the provisions of this paragraph; or (iv) to the extent necessary to permit the performance of obligations under this Agreement.

15. **DISPUTE RESOLUTION.**

Retailer acknowledges that EchoStar deals with thousands of Retailers and that hundreds of thousands of incentive payments are made annually. Retailer acknowledges that any delay in notifying EchoStar of any alleged shortage or non payment, allegedly incorrect chargeback, or any other claim that may result in EchoStar's liability to Retailer for damages may impede EchoStar's ability to fully and timely investigate any such claim by Retailer. Retailer agrees that it is in each party's best interest to give EchoStar control over claims that have to be investigated and to allow EchoStar to investigate any such claim at the earliest possible moment as well as maintain an orderly method for handling Retailer claims. Accordingly, Retailer agrees to immediately inspect and review the statements described in Section 6.4 to determine any claims or disputes the Retailer believes exist and, in the event of any claim or dispute, to follow the procedures set forth below. Retailer also agrees to follow the below claims procedures for all other claims that may result in EchoStar's liability to Retailer for damages.

DGL

15.1 <u>**Claims for Breach or Default.**</u> IN THE EVENT OF AN OCCURRENCE THAT RENDERS, OR MIGHT RENDER, ECHOSTAR LIABLE TO RETAILER FOR ANY DAMAGES OR INJUNCTIVE RELIEF AS A RESULT OF ANY ALLEGED BREACH OR DEFAULT OF THIS AGREEMENT, RETAILER SHALL GIVE WRITTEN NOTICE OF SUCH OCCURRENCE AS SOON AS PRACTICABLE TO ECHOSTAR (A "NOTICE OF CLAIM"). IN NO EVENT SHALL ANY NOTICE OF CLAIM BE PROVIDED LATER THAN NINETY (90) DAYS AFTER THE DATE OF THE RELEVANT OCCURRENCE, OR THE SHORTEST PERIOD PERMITTED UNDER APPLICABLE LAW (IN THE EVENT THAT SUCH PERIOD IS IN EXCESS OF THE APPLICABLE PERIOD SET FORTH ABOVE). THE NOTICE OF CLAIM SHALL STATE: (A) THE DATE, TIME AND NATURE OF THE OCCURRENCE; (B) THE TOTAL AMOUNT CLAIMED BY RETAILER, IF ANY, IN CONNECTION WITH SUCH OCCURRENCE AND THE BASIS FOR ANY AMOUNT CLAIMED, AND (C) IDENTIFICATION OF ALL DOCUMENTS AND OTHER INFORMATION IN RETAILER'S CONTROL OR POSSESSION RELATING TO SUCH OCCURRENCE. RETAILER MAY SUBMIT A NOTICE OF CLAIM CONCERNING INCENTIVE PAYMENTS THROUGH ECHOSTAR'S RETAILER WEBSITE (http://retailer.echostar.com) IN ACCORDANCE WITH THE NOTICE OF CLAIM BUSINESS RULES. RETAILER MAY SUBMIT A NOTICE OF CLAIM CONCERNING ANY OTHER OCCURRENCE VIA ELECTRONIC MAIL TO executiveresolution@echostar.com WITH THE SUBJECT LINE "NOTICE OF CLAIM." AFTER SUBMITTING A NOTICE OF CLAIM, RETAILER SHALL PROVIDE ECHOSTAR WITH ANY AND ALL ADDITIONAL INFORMATION REQUESTED BY ECHOSTAR WITHIN THIRTY (30) DAYS AFTER RECEIPT OF ECHOSTAR'S REQUEST. ECHOSTAR SHALL BE ENTITLED TO HAVE ACCESS TO RETAILER'S BOOKS AND RECORDS DURING ITS INVESTIGATION OF RETAILER'S CLAIM. FAILURE TO STRICTLY COMPLY WITH THE PROVISIONS OF THIS SECTION 15.1 WITH RESPECT TO A PARTICULAR OCCURRENCE THAT RENDERS, OR MIGHT RENDER, ECHOSTAR IN BREACH OR DEFAULT OF THIS AGREEMENT AND LIABLE TO RETAILER FOR DAMAGES, SHALL CONSTITUTE A WAIVER BY RETAILER WITH RESPECT TO THE RELEVANT OCCURRENCE, INCLUDING ANY DAMAGES RELATED THERETO.

15.2 <u>**Mediation.**</u> The parties agree to submit any and all disputes, controversies or claims not otherwise barred or resolved under Section 15.1 or exempted under Section 15.4, which may arise between Retailer and/or any of its Affiliates, on the one hand, and EchoStar and/or any of its Affiliates, on the other hand, including but not limited to any and all disputes, controversies, and claims arising in connection with this Agreement including, without limitation, all disputes, controversies or claims related to: (i) the execution of this Agreement; (ii) the interpretation of this Agreement; (iii) a party's performance or failure to perform hereunder; (iv) the termination of this Agreement; and (v) any rights Retailer may have under dealer termination or non-renewal laws (collectively "Disputes"), to mandatory non-binding mediation (the "Mediation") in front of a single mediator. Either party may initiate a mediation by giving written notice to the other party describing the Dispute (a "Notice of Mediation). The Notice of Mediation shall include (1) a statement of the initiating party's position and a summary of arguments supporting that position, and (2) the name and title of the executive who will represent that party and of any other persons who will accompany the executive. The Mediation must be initiated within one (1) year of the event(s) giving rise to the Dispute. The Mediation shall take place in the city and County of Denver, Colorado at a mutually agreeable time and location before a mediator chosen by mutual agreement of the parties. Each party shall participate through a representative with full settlement authority and shall bear its own costs and expenses and one-half of the costs and expenses of the mediator. Any such Mediation must be concluded within 60 days of the Notice of Mediation. Nothing contained herein shall limit or restrict the rights of either party and/or its Affiliates to file a Notice of Arbitration and/or bring a request for injunctive relief against the other party and/or its Affiliates for either party's and/or its Affiliates' violations of Sections 3.2, 3.6, 3.7, 3.8, 5, 6.9, 7.2, 7.3, 9.1, 9.2, 9.3, 9.4, 11, and 14 or any provisions of any Other Agreement (as defined in Section 6.8).

15.3 <u>**Arbitration.**</u> Except as set forth in Section 15.4, below, any and all disputes, controversies or claims between Retailer and/or any of its Affiliates, on the one hand, and EchoStar and/or any of its Affiliates, on the other hand, including without limitation any and all disputes, controversies or claims arising out of or in connection with this Agreement, including but not limited to the validity of section 15.3, the circumstances concerning the execution of this Agreement, and allegations of fraud in the inducement, or which relate to the parties' relationship with each other or either party's compliance with any state or federal law, which are not settled through negotiation, the claim process above, or the mediation process set forth above, shall be resolved solely and exclusively by binding arbitration in accordance with both the substantive and procedural laws of Title 9 of the U.S. Code ("Federal Arbitration Act") and the Commercial Arbitration Rules of the American Arbitration Association. In the event of any conflict between the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association, the Federal Arbitration Act will control. The Arbitration must be initiated within ninety (90) days from the final day of mediation, or 150 days from the Notice of Mediation in the event Mediation is not concluded within 60 days of the Notice of Mediation, and shall be initiated by written notice from the initiating party to the other party stating the initiating party's intent to initiate arbitration ("Notice of Arbitration"). The Arbitration shall be conducted in the City and County of Denver, Colorado by a panel of three arbitrators who shall be selected as follows: (i) one arbitrator shall be selected by the claimant(s) within 30 days of sending the Notice of Arbitration; (ii) one arbitrator shall be selected by the respondent(s) within 30 days of the claimant(s) notifying respondent of the identity of claimant's arbitrator; and (iii) the third arbitrator shall be selected by the arbitrators chosen by the claimant(s) and the respondent(s) within 30 days of their appointment. The decision of the arbitrators shall be final and binding on the parties and any award of the arbitrators may be entered and enforced as a final judgment in any state or Federal court of competent jurisdiction in the United States. The parties agree that, in no event, shall the arbitrators' decision include a recovery under any theory of liability, or award in any amount, not expressly allowed under this Agreement, any Promotional Program or applicable Business Rules. In furtherance and without limitation of the foregoing, any award made by the arbitrators shall be within the limitations set forth in Section 12. The cost of any arbitration hereunder, including without limitation the cost of the record or transcripts thereof, if any, administrative fees, and all other fees involved, shall be paid by the party(ies) determined

DJS

by the arbitrators to not be the prevailing party(ies), or otherwise allocated in an equitable manner as determined by the arbitrators. NEITHER PARTY HERETO NOR ITS AFFILIATES MAY BRING ANY DEMAND FOR ARBITRATION AGAINST THE OTHER PARTY AND/OR ITS AFFILIATES IF IT AND/OR ITS AFFILIATES HAVE: (i) FAILED TO FULLY COMPLY WITH THE PROCEDURES SET FORTH IN SECTIONS 15.1 AND 15.2 provided, however, that nothing contained herein shall limit or restrict the rights of either party and/or its Affiliates to file a Notice of Arbitration and/or bring a request for injunctive relief against the other party and/or its Affiliates for either party's and/or its Affiliates' violations of Sections 3.2, 3.6, 3.7, 3.8, 5, 6.9, 7.2, 7.3, 9.1, 9.2, 9.3, 9.4, 11, and 14 or any provisions of any Other Agreement (as defined in Section 6.8).

15.4 Exceptions. Notwithstanding the foregoing, the request by either party for preliminary or permanent injunctive relief, whether prohibitive or mandatory, shall not be subject to mediation or arbitration and may be adjudicated solely and exclusively in the United States District Court for the District of Colorado or in the appropriate state court of competent jurisdiction located in Arapahoe County, Colorado pursuant to Section 15.5, below. Furthermore, notwithstanding anything to the contrary in this Agreement, either party and/or its Affiliates may, at any time without regard for the time limitations of restrictions set forth above and without regard for Section 15.2, file a Notice of Arbitration and/or bring a request for injunctive relief against either party and/or its Affiliates for either party's and/or its Affiliates' violations of Sections 3.2, 3.6, 3.7, 3.8, 5, 6.9, 7.2, 7.3, 9.1, 9.2, 9.3, 9.4, 11, and 14 or any of the provisions of any Other Agreement (as defined in Section 6.8).

15.5 Choice of Law; Consent to Jurisdiction. The relationship between the parties and their present and future Affiliates, including without limitation all disputes, controversies or claims, whether arising in contract, tort, or under statute, shall be governed by and construed in accordance with the laws of the State of Colorado, applicable to contracts to be made and performed entirely within the State of Colorado by residents of the State of Colorado, without giving any effect to its conflict of law provisions. In the event a lawsuit is brought for injunctive relief pursuant to sections 15.2, 15.3, or 15.4 above, such lawsuit shall be litigated solely and exclusively before the United States District Court for the District of Colorado. The parties and their present and future Affiliates consent to the *in personam* jurisdiction of the United States District Court for the District of Colorado and all Colorado State Courts for the purposes set forth in this Section 15 and waive, fully and completely, any right to dismiss and/or transfer any action pursuant to Title 28 U.S.C. Sections 1404 or 1406 (or any successor statute). In the event the United States District Court for the District of Colorado does not have subject matter jurisdiction over any such matter, then such matter shall be litigated solely and exclusively before the appropriate state court of competent jurisdiction located in Arapahoe County, State of Colorado.

15.6 Survival. The provisions of this Section 15 shall survive expiration or termination of this Agreement indefinitely (even if termination is due to a default or breach by EchoStar).

16. INSURANCE.

16.1 Retailer shall, at its sole cost and expense, procure and maintain throughout the Term of this Agreement the following insurance coverages:

16.1.1 Workers' Compensation or similar employee benefit act coverage with statutory limits as prescribed by the laws of any state in which Retailer conducts business operations in connection with this Agreement and Employers' Liability coverage with limits and a deductible that are reasonable and adequate for businesses involved in the sale, installation, service and repair of consumer electronics.

16.1.2 Commercial General Liability coverage including, without limitation, coverage for Premises/Operations, Product/Completed Operations, Blanket Contractual Liability, Independent Contractors, Broad Form Property Damage, and Personal/Advertising Injury with limits and a deductible that are reasonable and adequate for businesses involved in the sale, installation, service and repair of consumer electronics.

16.1.3 Commercial Automobile Liability coverage which includes coverage for all owned, hired, and non-owned vehicles with limits and a deductible that are reasonable and adequate for businesses involved in the sale, installation, service and repair of consumer electronics.

16.2 All such policies and coverages shall be primary and non-contributory, issued by insurers, licensed to do business in any state in which Retailer conducts business operations in connection with this Agreement, and endorsed to provide EchoStar at least 30-days prior notification of cancellation or material change in coverage.

DBS

17. **MISCELLANEOUS.**

17.1 **Waiver.** Except as otherwise set forth to the contrary in Section 15.1, the failure of any party to insist upon strict performance of any provision of this Agreement shall not be construed as a waiver of any subsequent breach of the same or similar nature. All rights and remedies reserved to either party shall be cumulative and shall not be in limitation of any other right or remedy which such party may have at law or in equity.

17.2 **Successor Interests; No Assignment by Retailer; Third Party beneficiaries.** This Agreement is binding upon the heirs, legal representatives, successors and permitted assigns of EchoStar and Retailer. In addition to, and not in limitation of the prohibition against assignment of payments set forth in Section 6.13, above, neither party shall assign this Agreement without the prior written consent of the other party, except that EchoStar may assign this Agreement to an Affiliate in whole or in part at any time without the consent of Retailer. Because this Agreement is made by EchoStar in reliance on the financial, business and personal reputation of Retailer and its ownership and management, any merger, reorganization or consolidation of Retailer shall be deemed an assignment and if any person not a substantial stockholder of Retailer (someone with less than a 25% interest) as of the date of this Agreement becomes a substantial stockholder of Retailer (equal to, or greater than a 25% interest), that shall be considered an assignment requiring EchoStar's consent hereunder. The provisions of this Agreement are for the exclusive benefit of the parties hereto, EchoStar's Affiliates and their heirs, legal representatives, successors and permitted assigns, and nothing in this Agreement, express or implied, is intended, or shall be deemed or construed, to confer upon any third party (other than as expressly set forth for Affiliates of EchoStar) any rights, benefits, duties, obligations, remedies or interests of any nature or kind whatsoever under or by reason of this Agreement.

17.3 **Construction and Interpretation.** Retailer and EchoStar hereby represent, warrant, acknowledge and agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or the Business Rules, any amendments or addendums hereof or Exhibits hereto.

17.4 **Severability.** The parties agree that each provision contained herein is material to each party's decision to enter into this agreement and therefore, this Agreement shall automatically terminate upon the issuance of a final judgment holding that any one or more of the provisions contained herein, or the application thereof to any person, entity, or circumstance, for any reason is invalid, illegal, or unenforceable in any respect, except for any provisions that this Agreement expressly states shall survive expiration or termination of this Agreement indefinitely (even if termination is due to a default or breach by EchoStar).

17.5 **Entire Agreement.** This Agreement, together with any documents and exhibits given or delivered pursuant to this Agreement, constitutes the entire agreement between the parties to this Agreement. Except as expressly provided by this Agreement, no party shall be bound by any communications between them on the subject matter of this Agreement unless the communication is (a) in writing, (b) bears a date contemporaneous with or subsequent to the date of this Agreement, and (c) is signed by all parties to this Agreement. On the date this Agreement becomes effective as provided herein, all prior agreements (with the exception of the Business Rules, Other Agreements as defined in Section 6.8, and any previous Exclusive Bounty Hunter Agreement) or understandings between the parties shall be null and void. The parties specifically acknowledge there are no unwritten side agreements or oral agreements between the parties which alter, amend, modify or supplement this Agreement. Any provision of this Agreement which logically would be expected to survive termination or expiration, shall survive for a reasonable time period under the circumstances, whether or not specifically provided in this Agreement (even if termination is due to a default or breach by EchoStar).

17.6 **Compliance with Law.** The parties shall comply with, and agree that this Agreement is subject to, all applicable federal, state, and local laws, rules and regulations, and all amendments thereto, now enacted or hereafter promulgated in force during the term of this Agreement.

17.7 **Force Majeure.** Notwithstanding anything to the contrary in this Agreement, neither party shall be liable to the other for failure to fulfill its obligations hereunder if such failure is caused by or arises out of an act of force majeure including acts of God, war, riot, natural disaster, technical failure (including the failure of all or part of the communications satellite, or transponders on which the Programming is delivered to Qualifying Residential Subscribers, or of the related uplinking or other equipment) or any other reason beyond the reasonable control of the party whose performance is prevented during the period of such occurrence.

17.8 **Remedies Cumulative.** It is agreed that the rights and remedies herein provided in case of default or breach by Retailer of this Agreement are cumulative and shall not affect in any manner any other remedies that EchoStar may have by reason of such default or breach by Retailer. The exercise of any right or remedy herein provided shall be without prejudice to the right to exercise any other right or remedy provided herein, at law, or in equity.

17.9 **Records and Audit Rights.** During the Term of this Agreement and for a period of three (3) years thereafter, Retailer shall keep and maintain at its principal place of business complete and accurate records and books of account in connection with its performance under this Agreement. Such books and records shall be in sufficient detail to show all information necessary to support Retailer's claim, request or entitlement to any payments from EchoStar. EchoStar shall have the right, upon two (2) days prior written notice, to review, audit and make copies of Retailer's books and records for the purpose of determining Retailer's compliance with its duties and obligations under this Agreement (an "Audit"). EchoStar shall be entitled to conduct an Audit regardless of the existence of

BGI

any claim, dispute, controversy, mediation, arbitration or litigation between the parties. In the event Retailer refuses to allow EchoStar to conduct an Audit, Retailer acknowledges that EchoStar shall be entitled to obtain immediate relief in the form of specific performance from either the panel of arbitrators (if arbitration has been commenced pursuant to Section 15, above) or a court of competent jurisdiction. Any audit conducted by EchoStar shall be conducted by EchoStar or its representative(s) at Retailer's offices during normal business hours. If an Audit reveals that Retailer has miscalculated any item bearing upon the Incentives paid to Retailer resulting in an overpayment of Incentives by EchoStar, Retailer agrees to: (i) repay to EchoStar the amount of any overpayment made together with interest thereon at the highest rate allowed by law computed from the date of the overpayment; and (ii) pay all reasonable costs and expenses, including reasonable attorney's fees and accountants fees incurred by EchoStar in connection with its Audit and with enforcing the collection of such amounts. The provisions of this Section are without prejudice to any other rights and remedies that EchoStar and/or its Affiliates may have under this Agreement, at law, in equity or otherwise (all of which are hereby expressly reserved), and shall survive expiration or termination of this agreement for any reason whatsoever indefinitely (even if termination is due to a default or breach by EchoStar).

17.10 <u>Notices</u>. Except as otherwise provided in section 15.1, all notices to be given to EchoStar pursuant to this Agreement shall be in writing, signed by the Retailer, and sent by: (i) first class certified mail, postage prepaid; or (ii) overnight courier service, charges prepaid, to EchoStar, attention Director of Retail Services at the address listed on the first page of this Agreement with a copy to David K. Moskowitz, General Counsel at the same address, or such other address(es) as EchoStar may designate in writing to Retailer in accordance with this Section. Such notice shall be deemed given upon its receipt. Except as set forth in Section 6.2, all notices to be given to Retailer pursuant to this Agreement shall be in writing and sent by: (i) first class certified mail, postage prepaid; or (ii) overnight courier service, charges prepaid to Retailer at the address listed on the first page of this Agreement or such other address as Retailer may designate in writing delivered to EchoStar in accordance with this Section; or (iii) with the exception of notices given pursuant to Sections 10, 13 or 15, any method of mass communication reasonably directed to EchoStar's retailer base, including, without limitation, a fax blast, email or posting on EchoStar's retailer web site. Such notice shall be deemed given upon receipt in the case of first class mail or overnight courier service, fax blast or email and upon posting in the case of posting on EchoStar's retailer web site. It shall be Retailer's sole responsibility to keep itself informed of all notices, changes, or other information set forth in any fax blast, Charlie Chat or on EchoStar's retailer web site.

17.11 <u>Attorneys' Fees</u>. In the event of any suit, action or arbitration between Retailer and/or any of its Affiliates, on the one hand, and EchoStar and/or any of its Affiliates, on the other hand, including but not limited to any and all suits, actions or arbitrations to enforce this Agreement, any Business Rules, any Promotional Program or any provisions thereof, the prevailing party shall be entitled to recover its costs, expenses and reasonable attorneys' fees, at arbitration, at trial and on appeal, in addition to all other sums allowed by law. The provisions of this Section shall survive expiration or termination of this Agreement indefinitely (even if termination is due to a default or breach by EchoStar).

17.12 <u>Modifications</u>. Retailer acknowledges that EchoStar competes in the multi-channel video distribution market, which is highly competitive, fluid and volatile and that EchoStar must make changes to its marketing, promotion and sales of products from time to time to stay competitive. Therefore, Retailer agrees that EchoStar may, at any time and for any reason in its sole discretion, change or modify Incentives, Incentive schedules, Incentive structures, Promotional Programs, Business Rules, payment terms, or the chargeback rules associated therewith, upon notice to Retailer, without the need for any further consent, written or otherwise, from Retailer. IF ANY SUCH MODIFICATION OR CHANGE IS UNACCEPTABLE TO RETAILER, RETAILER'S ONLY RECOURSE IS TO TERMINATE THIS AGREEMENT. RETAILER'S CONTINUED PERFORMANCE UNDER THIS AGREEMENT FOLLOWING RECEIPT OF NOTICE OF A CHANGE OR MODIFICATION WILL CONSTITUTE RETAILER'S BINDING ACCEPTANCE OF THE CHANGE OR MODIFICATION. Except for such changes, and any other changes identified in this Agreement, any Promotional Program, Business Rules, or Other Agreement (as defined in Section 6.8) which may be made by either party in its sole discretion, any modification to this Agreement must be in writing and signed by both parties.

17.13 <u>Interstate Commerce</u>. The parties acknowledge that the transactions contemplated by this Agreement involve interstate commerce.

17.14 <u>General Provisions</u>. The exhibits attached hereto are fully incorporated into this Agreement.

RETAILER AND ECHOSTAR HEREBY REPRESENT, WARRANT, ACKNOWLEDGE AND AGREE THAT: (A) THEIR INDEPENDENT COUNSEL HAS REVIEWED, OR THEY HAVE BEEN GIVEN A REASONABLE OPPORTUNITY FOR THEIR INDEPENDENT COUNSEL TO REVIEW (BUT DECLINED SUCH REVIEW), THIS AGREEMENT; (B) THE TERMS AND CONDITIONS OF THIS AGREEMENT, AND EACH AND EVERY PARAGRAPH AND EVERY PART HEREOF, HAVE BEEN COMPLETELY AND CAREFULLY READ BY, AND EXPLAINED TO, THE PARTIES; (C) THE TERMS AND CONDITIONS OF THIS AGREEMENT ARE FULLY AND COMPLETELY UNDERSTOOD BY EACH PARTY AND EACH PARTY IS COGNIZANT OF ALL OF SUCH TERMS

DES

AND CONDITIONS AND THE EFFECT OF EACH AND ALL OF SUCH TERMS AND CONDITIONS; (D) THIS AGREEMENT IS MADE AND ENTERED INTO VOLUNTARILY BY EACH PARTY, FREE OF UNDUE INFLUENCE, COERCION, DURESS, MENACE OR FRAUD OF ANY KIND WHATSOEVER, AND HAS BEEN EXECUTED BY EACH PARTY OF THEIR OWN FREE WILL.

IN WITNESS WHEREOF, the parties hereto have signed and/or electronically accepted, this Agreement by their duly authorized representatives as of the date first written above.

**ECHOSTAR SATELLITE L.L.C.**

By: EchoStar DBS Corporation, its sole member

By: ______________________

Name:

Title:

**RETAILER**

Retailer Company Name: TON SERVICES INC.

Street Address: 4185 Harrison Blvd Suite 301

City, State, Zip Code: OGDEN, UT 84403

Facsimile number: 801-624-4530
(See Notice to Retailer pursuant to Section 17.10)

By: [signature]
Signature

Name (Please Print): JAGJIT SINGH

Title (Please Print): PRESIDENT

[SIGNATURE PAGE OF INCENTIVIZED RETAILER AGREEMENT]

**ATTACHMENT A**

**TRADEMARK LICENSE AGREEMENT**

THIS TRADEMARK LICENSE AGREEMENT (the "Agreement") is made and effective as of the ______day of ____________, 2004, by and between EchoStar Satellite L.L.C., formerly known as EchoStar Satellite Corporation ("ESLLC"), having a place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112, and ______________________________, having a place of business at ______________________________ ("Licensee").

A. ESLLC conducts business in worldwide locations as, among other things, a provider of direct broadcast satellite-delivered, multi-channel, digital video, audio and data services ("Programming"); and

B. Licensee conducts business as, among other things, a retailer of satellite television products and services; and

C. Licensee desires to be permitted to use the EchoStar trademarks, service marks and trade names set forth in Exhibit 1 hereto, which may be amended at any time and from time to time in ESLLC's sole discretion for any reason or no reason (the "Trademarks"), as ESLLC, in its sole discretion for any reason or no reason, may authorize, from time to time, under a non-exclusive license, to promote and solicit orders for DISH Network Programming.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1. ESLLC hereby grants to Licensee a non-exclusive, non-transferable, revocable license (the "License") to use the Trademarks and such other trademarks as ESLLC may from time to time expressly in writing permit Licensee to use during the term of this Agreement, and no other term or license whatsoever, solely to promote the retail sale of ESLLC satellite television programming and the hardware necessary to receive such programming in its local advertising and promotional materials and at its business locations. Licensee shall have no right to use the logos, service marks or trademarks (whether in typewritten, stylized or any other form) of any programming providers, other than the logos, service marks and trademarks of programming providers that are contained in the advertising and promotional material provided to Licensee by ESLLC. No such materials shall indicate that any agreement of agency, partnership, joint venture, franchise or exclusive or non-exclusive distributorship exists between Licensee and ESLLC, unless ESLLC and Licensee enter into a separate written agreement permitting Licensee to do so. Notwithstanding the above, Licensee shall provide to ESLLC, at least thirty (30) days prior to first use, an example of any advertising or promotional materials in which Licensee intends to use any Trademarks or any such other trademarks (whether in typewritten, stylized or any other form), which use has not, within the past twelve months, been approved by ESLLC in exactly the manner intended for use. ESLLC may reject and prohibit Licensee from using such materials, in its sole discretion for any reason or no reason. If Licensee is required to, but fails to provide ESLLC with proposed advertising or promotional materials at least thirty (30) days prior to first use, ESLLC shall have just cause to immediately terminate this Agreement by providing written notice to Licensee to that effect. This Agreement is not intended, nor shall it be construed, as creating any agreement of agency, partnership, joint venture, franchise or of exclusive or non-exclusive distributor, or as creating any obligation on the part of ESLLC to enter into any such agreement with Licensee. Further, this Agreement is not intended, nor shall it be construed, as providing any rights to Licensee to purchase or sell products or programming manufactured and/or distributed by ESLLC. Licensee expressly recognizes and agrees that any goodwill now existing or hereafter created through any sales by Licensee of products or programming manufactured and/or distributed by ESLLC, shall inure to ESLLC's sole benefit. This License shall be effective until terminated by either party in accordance with the terms of this Agreement, or until termination of the Incentivized Retailer Agreement to which this Agreement is attached for any reason whatsoever.

2. The License granted by ESLLC is granted to Licensee only. Licensee has no authority to transfer or grant any sublicense to any other entity or individual for any reason, and if Licensee does so, such action shall terminate this Agreement, at ESLLC's option, at any time thereafter. Licensee shall immediately cease using Trademarks in typewritten, stylized or any other form upon termination or expiration of this Agreement for any reason whatsoever. Upon expiration or termination of this Agreement for any reason whatsoever, at ESLLC's option Licensee shall immediately destroy or deliver to ESLLC any and all advertising and promotional materials in Licensee's possession with Trademarks (whether in typewritten, stylized or any other form) on them. If ESLLC requests destruction of advertising and promotional materials, Licensee shall promptly execute an affidavit representing at a minimum that such materials were destroyed, and the date and means of destruction.

3. Licensee expressly recognizes and acknowledges that this License, as well as any past use of the Trademarks in any manner whatsoever by Licensee (including but not limited to use on signs, business cards, or in advertisements) or in any form whatsoever by Licensee (including but not limited to typewritten or stylized form), shall not confer upon Licensee any proprietary rights or interest to any Trademarks including, but not limited to any existing or future goodwill in the Trademarks. All goodwill in the Trademarks shall inure to ESLLC's sole benefit. Further, Licensee waives any and all past, present, or future claims it has or might have to the Trademarks (whether in typewritten, stylized or any other form) and acknowledges that as between ESLLC and Licensee, ESLLC has the exclusive rights to own and use the Trademarks (whether in typewritten, stylized or any other form), and that ESLLC retains full ownership of the Trademarks (whether in typewritten, stylized or any other form) notwithstanding the License granted herein. While Licensee has no right or authority to do so, in the event that Licensee has previously, or in the future reserves, files, or registers any of the Trademarks of ESLLC (whether in typewritten, stylized or any other form) or registers any domain name which includes all or any portion of the Trademarks of ESLLC, Licensee agrees to

notify ESLLC immediately, and immediately upon request of ESLLC, to assign any and all interest to ESLLC that is obtained through the reservation, filing, or registration of the Trademarks in the U.S. or any foreign jurisdiction or through the registration of any domain name, and hereby acknowledges that any such reservation, filing, or registration of the Trademarks or domain name which includes all or any portion of the Trademarks, whenever occurring, shall be on behalf of and for the sole benefit of ESLLC, and Licensee waives all claims or rights to any compensation whatsoever therefore. Licensee's obligations in this paragraph shall survive the expiration or termination (for any reason whatsoever) of this Agreement indefinitely.

4. Furthermore, Licensee agrees not to hold itself out as DISH Network, ESLLC or any related or affiliated entity. To avoid any confusion in this respect, Licensee agrees not to use either (i) the formative "DISH" in combination with the formative "NET", or (ii) the formative "ECHO" as part of its business name. Furthermore, Licensee agrees not to register any domain name which contains either (a) the formative "DISH" in combination with the formative "NET", or (b) the formative "ECHO" and Licensee further agrees to immediately transfer to ESLLC, upon ESLLC's request, any such domain names which it has registered. Licensee's failure to comply with the provisions of this Section 4 shall constitute a material breach of this Agreement.

5. Nothing in this Agreement shall be construed to bar ESLLC from protecting its right to the exclusive use of its Trademarks (whether in typewritten, stylized or any other form) against infringement thereof by any party or parties, including Licensee, either during the term of this Agreement or following any expiration or termination of Licensee's right to use the Trademarks pursuant to this Agreement for any reason whatsoever. Licensee will promptly and fully advise ESLLC of any use of any mark that may appear to infringe the Trademarks (whether in typewritten, stylized or any other form). Licensee will also fully cooperate with ESLLC in defense and protection of the Trademarks (whether in typewritten, stylized or any other form), at ESLLC's expense. Similarly, nothing in this Agreement shall be construed to require that ESLLC take any action to protect the Trademarks in any instance, and ESLLC shall not be liable to Licensee in any manner whatsoever for failure to take any such action.

6. (a) This Agreement shall continue for a period of time equal to the term of the Incentivized Retailer Agreement to which this Agreement is attached, unless terminated earlier for a reason provided herein. In addition to any provisions of this Agreement that survive termination or expiration of this Agreement by their term, any provision of this Agreement which logically would be expected to survive termination for any reason whatsoever or expiration, shall survive for a reasonable time period under the circumstances, whether or not specifically provided in this Agreement.

(b) This Agreement may be terminated by a party (the "Affected Party") in the event that the other party (the "Other Party") defaults on any obligation or breaches any representation, warranty or covenant in this Agreement (regardless of whether breach or default of such obligation, representation, warranty or covenant is designated as giving rise to a termination right), and such default or breach, if curable, is not cured within twenty (20) days of receipt of written notice from the Affected Party. The parties agree that all obligations, representations, warranties and covenants contained in this Agreement, whether or not specifically designated as such, are material to the agreement of the parties to enter into and continue this Agreement.

(c) This Agreement shall terminate automatically upon termination of the Incentivized Retailer Agreement to which this Agreement is attached for any reason whatsoever and upon termination of any Other Agreement (as defined in Section 6.8 of the Incentivized Retailer Agreement to which this Agreement is attached) for any reason, unless EchoStar notifies Licensee to the contrary in writing.

7. The relationship between the parties including all disputes and claims, whether arising in contract, tort, or under statute, shall be governed by and construed in accordance with the laws of the State of Colorado without giving any effect to its conflict of law provisions. Licensee and EchoStar acknowledge and agree that they and their counsel have reviewed, or have been given a reasonable opportunity to review, this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments of Exhibits hereto.

Any and all disputes arising out of, or in connection with, the interpretation, performance or the nonperformance of this Agreement or any and all disputes arising out of, or in connection with, transactions in any way related to this Agreement and/or the relationship for any reason whatsoever between the parties (including but not limited to the termination of this Agreement or the relationship and Licensee's rights thereunder or disputes under rights granted pursuant to statutes or common law, including those in the state in which Licensee is located) shall be litigated solely and exclusively before the United States District Court for the District of Colorado. The parties consent to the *in personam* jurisdiction of said court for the purposes of any such litigation, and waive, fully and completely, any right to dismiss and/or transfer any action pursuant to 28 U.S.C.S. 1404 or 1406 (or any successor statute). In the event the United States District Court for the District of Colorado does not have subject matter jurisdiction of said matter, then such matter shall be litigated solely and exclusively before the appropriate state court of competent jurisdiction located in Arapahoe County, State of Colorado.

8. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have signed and/or electronically accepted, this Agreement by their duly authorized representatives as of the date first written above.

**ECHOSTAR SATELLITE L.L.C.**

By: EchoStar DBS Corporation, its sole member

By: ______________________
Name:
Title:

**LICENSEE**

Retailer Company Name: TON SERVICES INC.

By: [signature]
Signature

Name (Please Print): JAGJIT SINGH

Title (Please Print): PRESIDENT

[SIGNATURE PAGE OF TRADEMARK LICENSE AGREEMENT]

EXHIBIT 1 TO TRADEMARK LICENSE AGREEMENT

ECHOSTAR®

dish NETWORK™

dish™