Exhibit B

**COMMERCIAL AMENDMENT TO**
**ECHOSTAR SATELLITE L.L.C.**
**INCENTIVIZED RETAILER AGREEMENT**

This Amendment (the "Amendment") is made and effective as of this ___ day of __________, 2004, by and between EchoStar Satellite L.L.C., formerly known as EchoStar Satellite Corporation ("EchoStar"), having a principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112, and ______________________________, having a principal place of business at ______________________________ ("Retailer") (EchoStar and Retailer are occasionally referred to herein individually as "Party" and collectively as the "Parties").

WHEREAS, EchoStar and Retailer have previously entered into a written agreement entitled EchoStar Satellite L.L.C. Incentivized Retailer Agreement (the "Agreement");

WHEREAS, the Parties wish to amend the Agreement as described below;

NOW, THEREFORE, in consideration of the benefits which will accrue to each Party as a result of the matters described below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties mutually agree to amend the Agreement as follows:

I. Sections 2.17 through 2.27 shall be added as follows:

2.17 "Commercial Location" shall mean a Public Commercial Location and/or a Private Commercial Location, as those terms are defined below.

2.18 "Public Commercial Location" means a place of business in the Territory which is fully accessible to members of the general public without charge, often classified within the hospitality industry for the purpose of immediate consumption of food and/or liquor. Public Commercial Locations are generally registered with a Fire Occupancy Certificate. No satellite master antenna television or private cable system in a commercial or residential multiple dwelling unit (i.e., hotels, hospitals, dormitories, etc.) shall be considered a Public Commercial Location, however Public Commercial Locations within such multiple dwelling units (e.g., a restaurant within a hotel or hospital) shall be considered a Public Commercial Location. For example, bars, restaurants, clubs, casinos, lounges, and shopping malls are typically Public Commercial Locations. EchoStar shall have the right to determine, in its sole discretion, whether a location constitutes a Public Commercial Location, or is more appropriately considered a Residential Location, Private Commercial Location, or other location.

2.19 "Private Commercial Location" means a place of business in the Territory, which may be accessible to members of the general public, and classified outside of the hospitality industry. For example, office reception areas or waiting rooms and the private offices of attorneys, doctors/dentists, and other business professionals are typically Private Commercial Locations. EchoStar shall have the right to determine, in its sole discretion, whether a location constitutes a Private Commercial Location, or is more appropriately considered a residential location, Public Commercial Location, or other location.

2.20 "Institutional/Residential Locations" are properties that broadcast the DISH Network signal in a non-public, common viewing area within a property that is owned or operated by a government or commercial entity, in which employees are being provided residential living accommodations to facilitate the requirements of their job responsibilities. These properties may include fire stations, oil rigs, coast guard stations, as determined in EchoStar's sole discretion.

2.21 "Guest Property" means a hotel, motel, hospital or other healthcare facility, or such other similar type of facility regularly permitting overnight or otherwise short-term stays by individuals, as EchoStar may determine in its sole discretion.

2.22 "MDU Property" means a dormitory, apartment building, condominium or retirement community, or other type of multifamily living establishment that affords residents living quarters, as EchoStar shall determine in its sole discretion.

2.23 "Qualifying Commercial Subscriber" means (i) a commercial enterprise providing programming on a bulk basis, assuming 100% penetration, to a Guest Property or a bulk-billed MDU Property in the Territory who orders Bulk Programming packages designated by EchoStar as qualifying for the payment of Incentives under this Agreement and as set





RS

forth in the Business Rules (which may be changed in EchoStar's sole discretion at any time for any reason) or (ii) a business at a Commercial Location in the Territory who orders Commercial Programming packages designated by EchoStar as qualifying for the payment of Incentives under this Agreement and as set forth in the Business Rules (which may be changed in EchoStar's sole discretion at any time for any reason), who timely pays for the Commercial Programming or Bulk Programming, as applicable, in full and who has not violated any of the terms and conditions set forth in the EchoStar Commercial Customer Agreement, and who has never previously received any audio, video, data, or any other programming services from EchoStar or any Affiliate of EchoStar. A Qualifying Commercial Subscriber shall not include any individual who would otherwise qualify, but whose equipment EchoStar, in its sole discretion for any reason, declines to activate for any reason.

2.24 "Commercial Programming" means the DISH Network Programming services which EchoStar makes generally available for viewing in Commercial Locations subject to any restrictions (geographic, blackout, or otherwise) as EchoStar may impose on some or all such programming services for any reason at its sole discretion. EchoStar reserves the right to change the Commercial Programming services offered and/or any restrictions applicable to such Commercial Programming services at any time and for any reason in EchoStar's sole discretion. Unless specifically authorized by a separate written agreement between the Retailer and EchoStar, Retailer: (i) shall only solicit orders for Commercial Programming which are specifically designated and authorized by EchoStar for reception at Commercial Locations; and (ii) shall not be entitled to any Incentive related to the delivery of Programming to Commercial Locations which was intended for Residential Locations.

2.25 "Bulk Programming" means the DISH Network Programming services EchoStar makes generally available for viewing in Guest Properties and bulk-billed MDU Properties, subject to any restrictions (geographic, blackout, or otherwise) as EchoStar may impose on some or all such programming services at any time for any reason at its sole discretion. EchoStar reserves the right to change the Bulk Programming services offered and/or any restrictions applicable to such Bulk Programming services at any time and for any reason in EchoStar's sole discretion.

2.26 "Unit" means: (i) for hospitals and other healthcare facilities, each television on the premises, (ii) for hotels, motels, and all other Guest Buildings, each room in the Guest Building, and (iii) for MDU Properties each separate living quarters.

2.27 "Residential Programming" means the Programming that EchoStar makes generally available for viewing in Residential Locations, Institutional/Residential Locations and non-bulk-billed MDU Properties subject to any restrictions (geographic, blackout, or otherwise) as EchoStar may impose on some or all such programming services in its sole discretion. EchoStar reserves the right to change the Residential Programming services offered and/or any restrictions applicable to such Residential Programming services at any time and from time to time in its sole discretion for any reason or no reason.

II. Section 2.10 shall be deleted in its entirety and replaced with the following:

2.10 "Programming" means DISH Network video, audio, data and interactive programming services.

III. Section 2.12 shall be deleted in its entirety and replaced with the following:

2.12 "Qualifying Residential Subscriber" means an individual at a Residential Location, an Institutional/Residential Location or a non-bulk-billed MDU Property in the Territory who orders Residential Programming packages designated by EchoStar as qualifying for the payment of Incentives under this Agreement and as set forth in the Business Rules (which may be changed in EchoStar's sole discretion at any time for any reason), who timely pays for the Residential Programming in full and who has not violated any of the terms and conditions set forth in the EchoStar Residential Customer Agreement, and who has never previously received any audio, video, data, or any other programming services from EchoStar or any Affiliate of EchoStar. A Qualifying Residential Subscriber shall not include any individual who would otherwise qualify, but whose equipment EchoStar, in its sole discretion for any reason, declines to activate for any reason.

IV. Section 2.15 shall be deleted in its entirety and replaced with the following:

2.15 "Subscriber Account" means the account set up and maintained by EchoStar for a Qualifying Residential Subscriber or a Qualifying Commercial Subscriber who purchased a DISH DBS System from Retailer and for whom Eligible Programming has been activated by EchoStar and which account remains active and in good standing.





NS

V. Section 3.1 shall be deleted in its entirety and replaced with the following:

3.1 Appointment. EchoStar appoints Retailer as a non-exclusive Authorized Retailer to promote and solicit orders for Programming, subject to all of the terms and conditions of this Agreement. The appointment set forth herein for the promotion of the DISH Network by Retailer shall apply to the same DBS service which may be operated by EchoStar or its Affiliates under a different name in the future. Retailer's authorization herein is limited to (i) the solicitation of orders for Residential Programming from, and the marketing, advertising and promotion of Residential Programming to, consumers at Residential Locations, Institutional/Residential Locations and non-bulk-billed MDU Properties, (ii) the solicitation of orders for Commercial Programming from, and the marketing, advertising and promotion of Commercial Programming to, commercial enterprises operating businesses at Commercial Locations, and (iii) the solicitation of orders for Bulk Programming from, and the marketing, advertising and promotion of Bulk Programming to, commercial enterprises providing Bulk Programming on a bulk-basis, assuming 100% penetration, to Guest Properties and bulk-billed MDU Properties.

VI. Section 3.6 shall be deleted in its entirety and replaced with the following:

3.6 Sale of DISH DBS Systems. Retailer agrees that as a condition precedent to eligibility to receive Incentives from EchoStar, it will not directly or indirectly sell, lease, or otherwise transfer possession of a DISH DBS System or Promotional Certificate to any person or entity whom Retailer knows or reasonably should know: (i) is not an end-user and/or intends to resell, lease or otherwise transfer it for use to another individual or entity; or (ii) intends to use it, or to allow others to use it, to view Residential Programming at a location other than a Residential Location, Residential/Institutional Location or non-bulk-billed MDU Property; or (iii) intends to use it, or to allow others to use it, or to resell, lease or otherwise transfer it for use in Canada, Mexico or at any other location outside of the Territory; or (iv) intends to have, or to allow others to have, Programming authorized for it under a single DISH Network account that has or will have Programming authorized for multiple satellite receivers that are not all located in the same Residential Location, Institutional/Residential Location, bulk-billed MDU Property, Unit of a non-bulk-billed MDU Property, Guest Property or Commercial Location, as applicable based upon the type of Programming authorized for the relevant DISH Network account, and connected to the same phone line (except in the case of a bulk-billed MDU Property). It shall be Retailer's responsibility to investigate and determine whether any sale by Retailer would be in violation of this Section. In the event that Retailer directly or indirectly sells, leases or otherwise transfers possession of a DISH DBS System or Promotional Certificate to a person or entity who uses it, allows others to use it, or resells, leases or otherwise transfers it for use to permit the viewing of Residential Programming at a location other than a Residential Location, Residential/Institutional Location or non-bulk-billed MDU Property, then Retailer agrees to pay to EchoStar upon demand: (a) the difference between the amount actually received by EchoStar for the Programming authorized for the DISH DBS System and the full commercial rate for such Programming (regardless of whether EchoStar has or had commercial distribution rights for such Programming); and (b) the total amount of any admission charges or similar fees imposed for listening to or viewing such Programming (regardless of whether such charges and/or fees were imposed or collected by Retailer). In the event that Retailer directly or indirectly sells, leases or otherwise transfers possession of a DISH DBS System or Promotional Certificate to a person or entity who has, allows others to have, or resells, leases or otherwise transfers it to others who have Programming authorized for it under a single DISH Network account that at any time has Programming authorized for multiple DISH DBS Systems that are not all located in the same Residential Location, Institutional/Residential Location, bulk-billed MDU Property, Unit of a non-bulk-billed MDU Property, Guest Property or Commercial Location, as applicable based upon the type of Programming authorized for the relevant DISH Network account, and connected to the same phone line (except in the case of a bulk-billed MDU Property), and Retailer knew or reasonably should know that the person or entity intended to have, allows others to have or resell, lease or otherwise transfer it to others who would have Programming authorized for the DISH DBS System under such an account, then Retailer agrees to pay to EchoStar upon demand, the difference between the amount actually received by EchoStar for the Programming authorized under the single account and the full retail price for such Programming had each DISH DBS System authorized under the single account been authorized under a separate DISH Network account. IN THE EVENT THAT RETAILER BREACHES ANY OF ITS OBLIGATIONS UNDER THIS SECTION 3.6, ECHOSTAR SHALL BE ENTITLED TO CHARGE BACK AT ANY TIME (EVEN AFTER THE TERMINATION OR EXPIRATION OF THIS AGREEMENT) THE INCENTIVES, IF ANY, PAID TO RETAILER BY ECHOSTAR WITH RESPECT TO ANY SUBSCRIBER ACCOUNT AFFECTED BY SUCH BREACH OR DEFAULT. IN THE EVENT RETAILER WISHES TO DISPUTE ANY SUCH CHARGEBACK, RETAILER SHALL FOLLOW THE DISPUTE RESOLUTION PROCEDURES SET FORTH IN SECTION 15, BELOW. ECHOSTAR'S CALCULATION OF AMOUNTS OWING TO ECHOSTAR FROM RETAILER UNDER THIS SECTION 3.6 SHALL BE BINDING ABSENT FRAUD, MALICE OR WILLFUL AND WANTON MISCONDUCT ON THE PART OF ECHOSTAR. The foregoing provisions of this Section 3.6 are without prejudice to any other rights and remedies that

EchoStar and/or its Affiliates may have under this Agreement, at law, in equity or otherwise (all of which are hereby expressly reserved), and shall survive expiration or termination of this agreement for any reason whatsoever indefinitely (even if termination is due to a default or breach by EchoStar).

VII. Section 3.7 shall be deleted in its entirety and replaced with the following:

3.7 Pre-Activations. Retailer shall not directly or indirectly activate (a "Pre-activation") any DISH DBS System or DISH DBS receiver prior to installation of such DISH DBS System and/or receiver.

VIII. Sections 3.11 shall be added as follows:

3.11 Retailer shall ensure that no Guest Property or bulk-billed MDU Property engages directly or indirectly in: (a) the reselling of Bulk Programming (i.e., the property cannot charge more for the Bulk Programming than they pay to EchoStar); (b) the retransmission or rebroadcast of any Programming, except with the express written consent of EchoStar which EchoStar may withhold in its sole discretion for any reason; or (c) modifying, adding to, or deleting from any of the Bulk Programming. Retailer shall promptly notify EchoStar if it is aware of or suspects a change in the number of Units at any Guest or MDU Property subscribing to Programming. Retailer understands and agrees that Commercial Locations, MDU Properties, and Guest Properties may require the purchase of commercially-invoiced DISH DBS Systems, as further described in the Business Rules and adjustable at EchoStar's sole discretion.

IX. Section 6.1.1 shall be deleted in its entirety and replaced with the following:

6.1.1 Definition; Terms. Subject to the terms and conditions of this Agreement and any applicable Business Rules, for each DISH DBS System or Promotional Certificate that during the Term of this Agreement: (i) is sold to Retailer by EchoStar or any of its Affiliates, or a Third Party Manufacturer; and (ii) is re-sold by such Retailer directly to a Qualifying Residential Subscriber or Qualifying Commercial Subscriber; and (iii) results in the activation of Eligible Programming for a new Subscriber Account, Retailer may be eligible to receive a monthly incentive (the "Monthly Incentive"). The amount of such Monthly Incentive together with payment terms and other applicable terms and conditions shall be set forth in Business Rules which shall be distributed by EchoStar from time to time in accordance with Section 2.2, above. EchoStar in its sole discretion shall determine whether a particular EchoStar Subscriber is a new Subscriber Account eligible for the payment of Incentives hereunder. ECHOSTAR'S CALCULATION AND PAYMENT OF MONTHLY INCENTIVES SHALL BE PRESUMED CONCLUSIVELY AND IRREBUTABLY CORRECT ABSENT A TIMELY NOTICE OF CLAIM BY RETAILER PURSUANT TO SECTION 15.1

X. Section 6.2.1 shall be deleted in its entirety and replaced with the following:

6.2.1 Definition; Terms. During the Term of this Agreement, Retailer may be eligible to participate in and receive Incentives other than Monthly Incentives including, but not limited to, activation fee payments, flex payments, equipment discounts, and free professional installation payments, ("Additional Incentives") under such Promotional Programs as EchoStar may make available to Retailer in its sole discretion from time to time. The terms and conditions, including without limitation, eligibility requirements, governing each Additional Incentive shall be set forth in Business Rules which shall be distributed or otherwise made available by EchoStar from time to time in accordance with Section 2.2, above. RETAILER ACKNOWLEDGES AND AGREES THAT: (I) UNDER NO CIRCUMSTANCES SHALL ECHOSTAR HAVE AT ANY TIME ANY OBLIGATION TO OFFER ADDITIONAL INCENTIVES TO RETAILER, OR IF ADDITIONAL INCENTIVES ARE OFFERED TO OTHERS, TO ALTER OR AMEND THE BUSINESS RULES TO PERMIT RETAILER TO BE ELIGIBLE TO RECEIVE THEM; (II) IF ECHOSTAR OFFERS ANY ADDITIONAL INCENTIVES TO RETAILER THROUGH ANY PROMOTIONAL PROGRAM, RETAILER SHALL ONLY BE ELIGIBLE TO RECEIVE THE ADDITIONAL INCENTIVES IF AND TO THE EXTENT THAT IT MEETS ALL OF THE QUALIFICATION CRITERIA AND OTHER TERMS AND CONDITIONS SET FORTH IN THE APPLICABLE BUSINESS RULES AND THIS AGREEMENT; (III) UNLESS EXPRESSLY SET FORTH TO THE CONTRARY UNDER THE TERMS AND CONDITIONS OF THE RELEVANT PROMOTIONAL PROGRAM, ADDITIONAL INCENTIVES SHALL ONLY BE PAID TO RETAILER WITH RESPECT TO DISH DBS SYSTEMS OR PROMOTIONAL CERTIFICATES THAT: (A) ARE SOLD TO RETAILER BY ECHOSTAR OR ANY OF ITS AFFILIATES, OR A THIRD PARTY MANUFACTURER; (B) ARE RE-SOLD BY SUCH RETAILER DIRECTLY TO A QUALIFYING RESIDENTIAL SUBSCRIBER OR QUALIFYING COMMERCIAL SUBSCRIBER; AND (C) RESULT IN THE ACTIVATION OF ELIGIBLE PROGRAMMING FOR A NEW SUBSCRIBER ACCOUNT. ECHOSTAR IN ITS SOLE DISCRETION SHALL



DES

DETERMINE WHETHER A PARTICULAR ECHOSTAR SUBSCRIBER IS A NEW SUBSCRIBER ACCOUNT ELIGIBLE FOR THE PAYMENT OF INCENTIVES HEREUNDER. RETAILER ACKNOWLEDGES AND AGREES THAT IF IT CHOOSES TO PARTICIPATE IN ANY PROMOTIONAL PROGRAM IT WILL CAREFULLY REVIEW AND ADHERE TO ALL THE TERMS AND CONDITIONS SET FORTH IN THE BUSINESS RULES RELATED THERETO. FURTHERMORE, RETAILER'S PARTICIPATION IN ANY PROMOTIONAL PROGRAM OR RECEIPT OF ADDITIONAL INCENTIVES THEREUNDER SHALL SERVE AS RETAILER'S ACKNOWLEDGEMENT OF THE TERMS AND CONDITIONS SET FORTH IN THE RELEVANT BUSINESS RULES AND RETAILER'S AGREEMENT TO BE BOUND THERETO. ECHOSTAR'S CALCULATION AND PAYMENT OF ADDITIONAL INCENTIVES SHALL BE PRESUMED CONCLUSIVELY AND IRREBUTABLY CORRECT ABSENT A TIMELY NOTICE OF CLAIM BY RETAILER PURSUANT TO SECTION 15.1.

XI. Section 6.5.1 shall be deleted in its entirety and replaced with the following:

6.5.1 Retailer shall not be entitled to either Monthly Incentives (at anytime) or Additional Incentives (to the extent the relevant chargeback period set forth in the Business Rules has not expired) with respect to any Subscriber Account for which: (i) the Eligible Programming has been cancelled by anyone; (ii) payment in full for the Eligible Programming has not been timely received by EchoStar in accordance with the terms and conditions of the then current EchoStar Residential Customer Agreement or Commercial Customer Agreement (whichever is applicable); (iii) a credit or refund has been issued by EchoStar for any reason (EchoStar shall have the discretion to issue a credit or refund in its sole judgment); (iv) the subscriber would otherwise be a Qualifying Residential Subscriber or Qualifying Commercial Subscriber, but is already receiving—or previously received at any time—any of the Programming, or any other audio, video, data or other programming services from EchoStar or any of its Affiliates on the date of the order; (v) the Subscriber Account is otherwise terminated, disconnected or deactivated for any reason, without limitation; or (vi) the Qualifying Residential Subscriber or Qualifying Commercial Subscriber alleges that Retailer committed fraud or any other deceptive act or practice.

XII. Section 6.7 shall be deleted in its entirety and replaced with the following:

6.7 <u>Non-Incentivized Activations by EchoStar</u>. In the event that Retailer for any reason does not qualify for an Incentive with respect to any Qualifying Residential Subscriber, Qualifying Commercial Subscriber or any DISH DBS System whatsoever, EchoStar shall be entitled to activate Programming for that subscriber or DISH DBS System without payment of any Incentive to Retailer, even if Retailer solicited the Qualifying Residential Subscriber or Qualifying Commercial Subscriber to order Programming from EchoStar.

XIII. Section 17.7 shall be deleted in its entirety and replaced with the following:

17.7 <u>Force Majeure</u>. Notwithstanding anything to the contrary in this Agreement, neither party shall be liable to the other for failure to fulfill its obligations hereunder if such failure is caused by or arises out of an act of force majeure including acts of God, war, riot, natural disaster, technical failure (including the failure of all or part of the communications satellite, or transponders on which the Programming is delivered to Qualifying Residential Subscribers or Qualifying Commercial Subscribers, or of the related uplinking or other equipment) or any other reason beyond the reasonable control of the party whose performance is prevented during the period of such occurrence.

XIV. Except as expressly modified herein, this Amendment is not intended to, and does not, alter, amend or modify all or any part of the Agreement. The distribution of this Amendment shall not be construed as an admission or acknowledgement by EchoStar that an agreement exists between Retailer and EchoStar, that if an agreement exists, such agreement is in full force and effect, or that Retailer is not in breach or default thereunder. Nothing contained herein shall serve to revive an Agreement that has been terminated pursuant to Section 10.2, 10.3 or 10.4 thereof. Furthermore, nothing contained herein shall constitute a waiver by either party of any rights or remedies they may have under the terms and conditions of the Agreement.

XV. All terms not defined herein shall have the meaning ascribed to them in the Agreement.

XVI. This Amendment constitutes the entire agreement between the parties with respect to the subject matter hereof. The parties specifically acknowledge there are no unwritten side agreements or oral agreements between the parties which alter, amend, modify or supplement this Amendment.

DE

RETAILER AND ECHOSTAR HEREBY REPRESENT, WARRANT, ACKNOWLEDGE AND AGREE THAT: (A) THEIR INDEPENDENT COUNSEL HAS REVIEWED, OR THEY HAVE BEEN GIVEN A REASONABLE OPPORTUNITY FOR THEIR INDEPENDENT COUNSEL TO REVIEW (BUT DECLINED SUCH REVIEW), THIS AMENDMENT; (B) THE TERMS AND CONDITIONS OF THIS AMENDMENT, AND EACH AND EVERY PARAGRAPH AND EVERY PART HEREOF, HAVE BEEN COMPLETELY AND CAREFULLY READ BY, AND EXPLAINED TO, THE PARTIES; (C) THE TERMS AND CONDITIONS OF THIS AMENDMENT ARE FULLY AND COMPLETELY UNDERSTOOD BY EACH PARTY AND EACH PARTY IS COGNIZANT OF ALL OF SUCH TERMS AND CONDITIONS AND THE EFFECT OF EACH AND ALL OF SUCH TERMS AND CONDITIONS; (D) THIS AMENDMENT IS MADE AND ENTERED INTO VOLUNTARILY BY EACH PARTY, FREE OF UNDUE INFLUENCE, COERCION, DURESS, MENACE OR FRAUD OF ANY KIND WHATSOEVER, AND HAS BEEN EXECUTED BY EACH PARTY OF THEIR OWN FREE WILL.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed and/or accepted electronically by their duly authorized representatives as of the date first written above.

**ECHOSTAR SATELLITE L.L.C.**

By: EchoStar DBS Corporation, its sole member

By: ______________________
Name:
Title:

**RETAILER**

Retailer Company Name: TON SERVICES INC.

Street Address: 4185 HARRISON BLVD SUITE 301

City, State, Zip Code: OGDEN UT 84403

Facsimile number: 801-624-4530

By: [signature]
Signature

Name (Please Print): JAGJIT SINGH

Title (Please Print): PRESIDENT

DES

**ADDENDUM TO THE ECHOSTAR SATELLITE L.L.C. INCENTIVIZED RETAILER AGREEMENT**

This ADDENDUM TO THE ECHOSTAR SATELLITE L.L.C. INCENTIVIZED RETAILER AGREEMENT, (the "Addendum") is entered into by and among **TON Services Inc.**, ("Retailer"), a Utah corporation, and **EchoStar Satellite L.L.C., formerly known as EchoStar Satellite Corporation**, ("EchoStar"). The parties hereby understand and agree that this Addendum shall amend or supplement only those particular provisions as expressly provided herein and all other terms and conditions shall be governed by the EchoStar Satellite L.L.C. Incentivized Retailer Agreement entered into or to be entered into between the parties, (the "Agreement"), which shall be the same date as this Addendum.

**Additional Provisions.**

The following provision shall be added to the Agreement:

**Showroom Account.** The parties hereto understand and agree that EchoStar shall provide to Retailer, at a price reasonably agreed to between the parties, an activated Subscriber Account ("Showroom Account") and EchoStar agrees that Retailer may display such Showroom Account at any Public or Private Commercial Location as deemed necessary or appropriate by Retailer, including but not limited to, displaying such Programming at numerous locations within such Public or Private Commercial Locations. Notwithstanding any other term or condition set forth in any agreement entered into by and between the parties hereto, Retailer, its parent, affiliates, subsidiaries and assigns, hereby at all times reserve the right to display, at any Private or Public Commercial Location or any other location where Retailer, its parent, affiliates and subsidiaries maintain a presence, any video, audio, data, interactive programming services or any other media deemed necessary or appropriate by Retailer.

**Counterparts.**

This Addendum may be executed and delivered in as many counterparts as may be deemed necessary or convenient each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one of the same Addendum. Delivery of an executed counterpart of the signature page(s) to this Addendum by facsimile shall be effective as delivery of a manually executed counterpart of this Addendum, and any party delivering such an executed counterpart of the signature page(s) to this Addendum by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Addendum to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability or binding effect of this Addendum.

**Signature Authority.**

The undersigned hereby certifies that he/she has been duly authorized by all necessary and appropriate corporate action to execute this Addendum on behalf of the respective party to form a legally binding contract and understands that acceptance of the Addendum constitutes an agreement to be bound to perform in strict conformity with the terms and conditions set forth herein.

**IN WITNESS WHEREOF**, the parties have caused this Addendum to be duly executed and delivered by their respective officers thereunto duly authorized as of the Effective Date.

**RETAILER**
**TON Services Inc.**

By: [signature]

Name: JAGJIT SINGH

Title: PRESIDENT

**ECHOSTAR**
**EchoStar Satellite L.L.C., formerly known as EchoStar Satellite Corporation**

By: ______________________

Name: ______________________

Title: ______________________