UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

AMERICAN BROADCASTING COMPANIES, INC.,
CBS BROADCASTING INC., DISNEY ENTERPRISES,
INC., FOX BROADCASTING CO., SPELLING
TELEVISION, INC., SUPERSTATION, INC., TBS
FUNDING CORP., TURNER NETWORK TELEVISION
LP, LLLP, UNIVERSAL NETWORK TELEVISION, LLC,
and UNIVERSAL TELEVISION NETWORKS,

                    Plaintiffs,


          -against-                          06 Civ. 2967 (DAB)
                                             MEMORANDUM & ORDER


FLYING J, INC. and TON SERVICES, INC.,

                    Defendants.
------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     American Broadcasting Companies, Inc., CBS Broadcasting,

Inc., Disney Enterprises, Inc., Fox Broadcasting Company,

Spelling Television, Inc., Superstation, Inc., TBS Funding Corp.,

Turner Entertainment Networks, Inc., Turner Network Television

LP, LLLP, Universal Network Television LLC, and Universal

Television Networks (collectively "Plaintiffs") bring this action

against Flying J, Inc. and Ton Services, Inc. ("Defendants")

alleging copyright infringement under the Copyright Act, 17

U.S.C. § 101 et seq. and common law unfair competition.

Plaintiffs seek damages as well as an injunction against

Defendants' allegedly infringing conduct.  (Complaint ¶ 41.)

     Defendants have moved to dismiss the Complaint pursuant to

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/22/2007

Fed. R. Civ. P. 12(b)(6).  For the reasons set forth below, Defendants' Motion to Dismiss Count One of the Complaint, alleging copyright infringement, is DENIED and Defendants' Motion to Dismiss Count Two of the Complaint, alleging common law unfair competition, is GRANTED.

## I. BACKGROUND

The facts set forth herein are taken from the Complaint and are deemed to be true for the purpose of deciding Defendants' Motion to Dismiss.

Plaintiffs are leaders in the television entertainment and broadcast industry; they create, produce and distribute a substantial volume of the copyrighted entertainment, news and sports programming available to television viewers nationwide. (Complaint ¶ 15.)  Plaintiffs and their affiliates own some of the most popular television networks including ABC, CBS, NBC and FOX, as well as numerous cable television channels.  (Id. ¶ 17.) Many of the audiovisual works aired on Plaintiffs' networks and cable television channels are owned by others and Plaintiffs pay substantial licensing fees for the exclusive rights to broadcast these programs.  (Id.)

Plaintiffs derive a large portion of their revenues from the sale of television advertising time.  (Id. ¶ 15.)  The popularity

2

of Plaintiffs' copyrighted or exclusively licensed audiovisual
works is directly linked to the value of the television
advertising time that Plaintiffs' sell to their advertising
customers.  (<u>Id.</u>)  The revenues that Plaintiffs earn from the
sale of television advertising, in turn, provide the financial
incentives to create and broadcast new audiovisual works for the
viewing public.  (<u>Id.</u>)

Defendant Flying J operates a commercial chain of branded
truck stop facilities with 130 locations nationwide serving
approximately 140,000 people monthly.  (<u>Id.</u> ¶¶ 1, 18, 19.)
Defendants' truck stop facilities contain restaurants and
drivers' lounges.  (<u>Id.</u> ¶ 19.)  Within these areas of the truck
stops, Defendants provide several television sets for the benefit
of their patrons.  (<u>Id.</u>)  The television sets are "tuned to
regular programming supplied via direct broadcast satellite to
Flying J's truck stops by EchoStar Communications," which
operates as DISH Network.  (<u>Id.</u>)  Several of the television
channels that Defendants make available to their patrons for
viewing through DISH Network's satellite television service are
owned by Plaintiffs.  (<u>Id.</u>)  Additionally, Plaintiffs'
copyrighted or exclusively licensed audiovisual works are shown
on many of the television channels that can be publicly viewed at
Defendants' truck stop facilities.  (<u>Id.</u>)  Neither EchoStar

3

Communications nor DISH Network, however, are parties to
Plaintiffs' suit.

Defendants have developed a television advertising service
called Plaza TV that operates within Defendants' truck stop
facilities.  (Id. ¶ 22.)  Defendants' Plaza TV service uses a
device supplied by another non-party, segOne, Inc., to create a
commercial opportunity for Defendants to, in effect, re-sell to
their own advertising customers, television advertising time that
has already been sold to other advertisers.  (Id. ¶ 21.)  The
segOne devices are "incorporated into the television system
Flying J has installed in its truck stops."  (Id.)  The device,
which is "[i]nterposed between the truck stop's satellite dish
and each of its televisions" is used to detect "transitions
between the television programs and the commercial advertisements
transmitted by the direct broadcast satellite service to which
Defendants subscribe."  (Id.)  Whenever the segOne device detects
that a television program is about to transition to an
advertisement, it "plays pre-recorded substitute commercials sold
by TON and geared toward the Flying J customer demographic."
(Id.)  Defendants characterize the segOne device as follows:

> Put simply, segOne supplies, and Flying J deploys, a device
> that is nothing more than a fancy remote control.  Just as a
> viewer may use his television remote to change from a
> television program to content playing on a DVD player or a
> digital video recorder (DVR) such as TiVo, the segOne device

4

> uses a robot to automatically switch from television program
> to content stored in the segOne device.

(Defs'. Motion to Dismiss at 3.)  Thus, when the segOne device is used in conjunction with the DISH Network satellite television transmission publicly shown at Defendants' truck stops, Defendants' patrons are able to watch Plaintiffs' familiar television programs - as would be the case were they watching any other television set connected to DISH Network's service - but with a critical difference:  Instead of seeing those television advertisements that are normally interspersed between Plaintiffs' copyrighted or exclusively licensed programs, patrons see Plaza TV's advertisements.  (<u>Id.</u> ¶ 22.)  Defendants charge their own advertising customers more than $30,000 per month to air thirty-second television advertisements through the Plaza TV service. (<u>Id.</u>)

Plaintiffs specifically allege fifteen different occasions between December 17, 2005 and March 8, 2006 on which Defendants used their Plaza TV service and the segOne device to substitute their own television advertisements for those that were normally included in the DISH Network satellite television transmission shown at a Flying J truck stop located in Pembroke, New York. (<u>Id.</u> ¶ 24.)  For example, the Complaint alleges that:

5

> [o]n January 22, 2006, while the CBS telecast of the
> "American Football Conference Championship (Pittsburgh
> Steelers at the Denver Broncos)" was being shown in the
> driver's lounge, Defendants' Plaza TV Device replaced the
> commercial advertisements transmitted to Flying J's truck
> stop with advertisements for "American Truckers Legal
> Association," "First Funds," and "Speedco."

(Id. ¶ 24(j).)  Plaintiff CBS Broadcasting Inc. was allegedly the

"exclusive broadcast licensee of the January 22, 2006 telecast of

the 'American Football Conference Championship (Pittsburgh

Steelers at the Denver Broncos).'"  (Id. & Ex. 1.)  Defendants

are thus accused of usurping for their "own financial gain the

advertising opportunities created by the [audiovisual works] of

Plaintiffs and others."  (Id. ¶ 23.)

Count One of the Complaint alleges that "Defendants' public

performance of Plaintiffs' copyrighted works in their truck stops

utilizing Defendants' commercial replacement system violates,"

Plaintiffs' exclusive right to "publicly perform and authorize

others to publicly perform their copyrighted works."  (Id. ¶ 23.)

Plaintiffs allege further that Defendants cannot make use of the

limited statutory exemption under 17 U.S.C. § 110(5)(A), commonly

known as the "homestyle exemption", that permits "commercial

establishments . . . to publicly perform copyrighted works using

the kind of apparatus commonly used in private homes."  (Id. ¶

23.)

Count Two of the Complaint alleges that Defendants have misappropriated the popularity of Plaintiffs' copyrighted or exclusively licensed audiovisual works to compete unfairly against them in the television advertising business:  "Through [Defendants'] parasitic 'Plaza TV' advertising business, Defendants are reaping what they have not sown and have taken the skill, expenditures, and/or labors of Plaintiffs and used them to compete against [Plaintiffs]."  (<u>Id.</u> ¶ 38.)  In addition to damages, Plaintiffs seek preliminary and permanent injunctions to enjoin Defendants' conduct.  (<u>Id.</u> ¶ 41.)

## II. DISCUSSION

### A.   The Legal Standard for a Motion to Dismiss

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6) "the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff."  <u>Bolt Elec., Inc. v. City of New York</u>, 53 F.3d 465, 469 (2d Cir. 1995) (citations omitted).  A district court "should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  <u>Walker v. City of New York</u>, 974 F.2d 293, 298 (2d Cir. 1992) (quoting <u>Ricciuti v. New</u>

7

York City Transit Auth., 941 F.2d 119 (2d Cir. 1991)).  For
purposes of a motion to dismiss, a complaint is deemed to include
"any written instrument attached to it as an exhibit or any
statements or documents incorporated in it by reference . . . .
and documents that the plaintiffs either possessed or knew about
and upon which they relied in bringing the suit."  Rothman v.
Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (citing Cosmas v.
Hassett, 886 F.2d 8, 13 (2d Cir. 1989); Cortec Industries, Inc.
v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991)).


    B.    The Copyright Infringement Claim

    To establish a prima facie claim of copyright infringement,
a plaintiff must allege both "(1) ownership of a valid copyright
and (2) infringement of the copyright by the defendant."  Yurman
Design v. PAJ, Inc., 262 F.3d 101, 109 (2d Cir. 2001) (citing
Hamil America, Inc. v. GFI, 193 F.3d 92, 98 (2d Cir. 1999)).
Exclusive licensees have the same right to sue for copyright
infringement as actual copyright owners.  See 17 U.S.C. § 501(b);
Random House, Inc. v. Rosetta Books LLC, 283 F.3d 490, 491 (2d
Cir. 2002).  Whether a copyright owner or an exclusive licensee,
a plaintiff must specifically allege that the defendant infringed
one or more of "the copyright owner's five exclusive rights,
described at 17 U.S.C. § 106."  Microsoft Corp. v. Harmony

8

<u>Computers & Electronics, Inc.</u>, 846 F. Supp. 208, 210 (E.D.N.Y. 1994).  Plaintiffs must also specifically allege "by what acts during what time the defendant infringed the copyright."  <u>Kelly v. L.L. Cool J.</u>, 145 F.R.D. 32, 36 (S.D.N.Y. 1992) (citing <u>Franklin Electronic Publishers v. Unisonic Prod. Corp.</u>, 763 F. Supp. 1, 4 (S.D.N.Y. 1991)).

Count One of the Complaint alleges that Defendants have committed copyright infringement.  (Complaint ¶¶ 26-31.) Plaintiffs specifically allege that they own either the copyrights or exclusive licenses to fifteen audiovisual works and that "without any authorization from Plaintiffs," Defendants have publicly shown these works at their truck stop facilities at various times between December 17, 2005 and March 8, 2006 in conjunction with certain replacement advertisements that were shown by means of Defendants' Plaza TV service.  (<u>Id.</u> ¶¶ 24-25 & Ex. 1.)

Defendants do not dispute Plaintiffs' allegations that they are the copyright owners or exclusive licensees of the fifteen audiovisual works whose copyrights are alleged to have been infringed.  Defendants argue, rather, that the "Complaint is reticent about which of the protected uses under 17 U.S.C. § 106 is alleged to be transgressed."  (Defs'. Motion to Dismiss at 4.) The Complaint plainly alleges, however, that "Defendants' public

9

performance of Plaintiffs' copyrighted works in their truck stops utilizing Defendants' commercial replacement system violates this exclusive right of Plaintiffs." (Complaint ¶ 23.)  Plaintiffs therefore clearly allege that the specific "exclusive right" that Defendants have infringed is the copyright owners' right "to perform the copyrighted work publicly."  17 U.S.C. § 106(4); <u>see</u> <u>Harmony Computers & Electronics</u>, 846 F. Supp. at 210. Additionally, Plaintiffs have clearly alleged the specific acts by which Defendants allegedly have infringed their copyrights. <u>See</u> <u>L.L. Cool J.</u>, 145 F.R.D. at 36.

Defendants also argue that the Complaint does not clearly plead lack of authorization and that in any event the conduct alleged to be infringing is authorized by an agreement between EchoStar Communications and Defendants.  (Defs'. Motion to Dismiss at 5.)  Plaintiffs, however, clearly do allege that Defendants' public performance of their copyrighted audiovisual works in conjunction with the Plaza TV advertisement replacement system was "done without any authorization from Plaintiffs." (Complaint ¶ 25.)  Additionally, as discussed below, the Court finds that the agreement between Defendants and EchoStar Communications which Defendants claim "is an absolute bar to [Plaintiffs'] infringement action," terminated prior to the occurrence of the specific conduct that Plaintiffs allege was

10

infringing and did not, in any event, grant Defendants the
license they claim to have had.  (Defs'. Motion to Dismiss at 6.)
The Court finds that Plaintiffs have adequately pled a prima
facie claim of copyright infringement.

       1.    The "Incentivized Retailer Agreement" and the
               "Commercial Amendment" and "Addendum" thereto

Defendants contend that Count One of the Complaint, alleging
copyright infringement, should be dismissed on the grounds that
the conduct that Plaintiffs allege to be infringing was actually
authorized by a "specific, explicit, negotiated, fee-paid,
commercial license" held by Defendants pursuant to an agreement
between EchoStar Communications and Defendant TON.  (Defs'.
Motion to Dismiss at 7.)  Defendants submit that this agreement
was embodied in a document entitled "EchoStar Satellite LLC
Incentivized Retailer Agreement" which also includes a
"Commercial Amendment" and an "Addendum".  (Declaration of
Christopher Springman at Exs. A & B.)  The agreement, which does
not bear an effective date, would appear to have authorized, on a
non-exclusive basis, (assuming that it was properly executed)
Defendant TON to "market, promote and solicit orders" for the
satellite DISH Network service provided by EchoStar
Communications.  (<u>Id.</u> at Ex. A, ¶ B.)  The undated addendum to
the "Incentivized Retailer Agreement" contains a provision that

11

Defendants argue "*explicitly permits Flying J to display its own programming along with the programming supplied by EchoStar,*" i.e. "*explicitly allows* the very conduct that [Plaintiffs] contend is infringing." (Defs'. Reply at 6.)   The provision, headed "Showroom Account" is as follows:

> The parties hereto understand and agree that EchoStar shall provide to Retailer [Defendant TON], at a price reasonably agreed to by the parties an activated Subscriber Account ("Showroom Account") and EchoStar agrees that Retailer may display such Showroom Account at any Public or Commercial Location as deemed necessary or appropriate by Retailer, including but not limited to, displaying such Programming at numerous locations within such Public or Private Commercial Locations.   Notwithstanding any other term or condition set forth in any agreement entered into by and between the parties hereto, Retailer, its parent, affiliates, subsidiaries and assigns, hereby at all times reserve the right to display, at any Private or Public Commercial Location or any location where Retailer, its parent, affiliates and subsidiaries maintain a presence, any video, audio, data, interactive programming services or any other media deemed necessary or appropriate by Retailer.

(Declaration of Christopher Springman at Ex. B.)   The agreement defines "programming" to mean "the DISH Network video, audio, data and interactive programming services which EchoStar makes generally available to the public for viewing . . . subject to any restrictions (geographic, blackout or otherwise) as EchoStar may impose on some or all such [p]rogramming services for any reason in its sole discretion." (Id. at Ex. A, ¶ 2.10.)   The agreement provides that it shall terminate, at the latest, on December 31, 2004.   (Id. at Ex. A, ¶ 10.1.)

12

Defendants argue that the agreement is so integral to Plaintiffs' Complaint that the Court should consider its provisions in deciding this Motion to Dismiss.  <u>See</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152-53 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint").  As noted above, the agreement itself provides that it was effective only until December 31, 2004 at the latest. (<u>Id.</u> at Ex. A, ¶ 10.1.)  The specific acts of copyright infringement that Plaintiffs allege occurred between December 17, 2005 and May 8, 2006, after the agreement terminated.  (Complaint ¶ 24.)  Thus, it cannot be said that the allegations in the Complaint, which make no explicit reference to the agreement, rely in any way upon the terms and effects of the agreement.  The Court therefore need not consider the provisions contained in the agreement in deciding Defendants' Motion to Dismiss.

In any event, the Court notes that the specific provision of the agreement to which Defendants point did not explicitly authorize Defendants to perform publicly Plaintiffs' copyrighted audiovisual works along with the replacement advertisements shown by Defendants through their Plaza TV service.  And at this stage in the proceedings the Court must accept as true Plaintiffs'

13

allegation that it did not authorize the public performance of its "copyrighted works in this manner." (Complaint ¶ 25.) The provision contained in the addendum to the agreement is cast in such vague and generalized language that, for all practical purposes, it is silent on the subject of Plaintiffs' particular copyright infringement claims. Accordingly, Defendants' Motion to Dismiss Count One of the Complaint on the grounds that Defendants were explicitly licensed to perform publicly Plaintiffs' copyrighted audiovisual works is DENIED.

2.    Applicability of the "homestyle" exemption

Defendants argue that the statutory license or "homestyle" exemption under 17 U.S.C. § 110(5)(A) - which authorizes certain types of commercial establishments open to the public to perform copyrighted sound recordings and audiovisual works without explicit permission from copyright holders - has no application to Plaintiffs' copyright infringement claims. (Defs'. Motion to Dismiss at 7.) Defendants contend that "whether or not Flying J's use of the segOne technology locates it within or without the ambit of the homestyle exception is a question that is simply of no legal significance to this dispute." (Id.) As discussed above, Defendants contend that their conduct was specifically authorized by their agreement with EchoStar Communications. Arguing in the alternative, Defendants claim that, even were the

14

homestyle exemption to apply to Plaintiffs' allegations,

Defendants are entitled to the exemption's protection because the

Complaint contains no allegation that "Flying J's EchoStar

satellite dishes are in any way different from those sold to

millions of home users." (Defs'. Reply at 4.) The Court agrees

with Defendants that the homestyle exemption does not apply to

the copyright infringement allegations contained in the

Complaint.

> The homestyle exemption is provided for by statute:
>
> Notwithstanding the provisions of section 106, the following
> are not infringements of copyright . . .
>
> (5)(A) except as provided in subparagraph (B), communication
> of a transmission embodying a performance or display of a
> work by the public reception of the transmissions on a
> single receiving apparatus of a kind commonly used in
> private homes, unless (i) a direct charge is made to see or
> hear the transmission; or (ii) the transmission thus
> received is further transmitted to the public.

17 U.S.C § 110(5)(A). Congress explained the rationale for the

exemption as follows:

> The § 110(5) exemption will allow the use of ordinary radios
> and television sets for the incidental entertainment of
> patrons in small businesses or other professional
> establishments, such as taverns, lunch counters,
> hairdressers, dry cleaners, doctors' officers, etc.

S. Rep. No. 938, 93d Cong., 2d Sess. 130 (1974). As Defendants

note, most of the cases that have discussed the homestyle

exemption dealt with commercial establishments such as

15

restaurants and clothing stores which played copyrighted radio programs and music for their customers.

The Court of Appeals for the Seventh Circuit, in a case involving a sound system used to play copyrighted radio programs for store customers, fashioned a four-part test for application of the exemption:  "the exemption is available only if (1) a single receiving apparatus is used, (2) the single receiving apparatus is of a kind commonly used in private homes, (3) the transmission is provided free of charge, and (4) the transmission is not 'further transmitted' to the public."  <u>Broadcast Music, Inc. v. Claire's Boutiques, Inc.</u>, 949 F.2d 1482, 1489 (7th Cir. 1991), <u>cert. denied</u>, 504 U.S. 911 (1992).  Under the <u>Claire's Boutique</u> test, whether a sound system that receives and plays copyrighted radio programming is protected by the homestyle exemption turns on "whether the system, as installed and operated, is commonly found in homes."  <u>Cass County Music Co. v. Muedini</u>, 55 F.3d 263, 269 (7th Cir. 1995).

Reported cases that discuss the applicability of the homestyle exemption to the public performance of copyrighted audiovisual works such as television programs are few.  The leading case in the area dealt with taverns which showed certain "blacked out" football games to their patrons by picking-up "the signals for such games by means of a satellite dish antennae."

16

<u>National Football League v. McBee & Bruno's, Inc.</u>, 792 F.2d 726, 727 (8th Cir. 1986).[1]  The Court considered whether the homestyle exemption protected the tavern owners' showing of the blacked out games and specifically whether the satellite dish antennae they used were "of a kind commonly used in private homes".  The Court's inquiry focused on the factual determination of:

> How likely the average patron who watches a blacked-out [football game] at one of the defendant restaurants is to have the ability to watch the same game at home?  If it is likely – that is, if such systems are the "kind commonly used in private homes" – then the Section 110(5) exemption applies.

<u>Id.</u> at 731.  The Court noted that this particular test applied to the narrow set of circumstances where "plaintiffs intend that their work not be performed <u>at</u> <u>all</u> outside their aegis, making the fact of reception rather than just its quality the primary consideration."  <u>Id.</u> (emphasis in original).  Finding that the satellite dish antennae used by the tavern owners were not, at

---

[1]  The Court explained that the National Football League's contracts with television broadcasters to telecast live football games commonly contained a provision that:

> games not sold out within 72 hours of game time are to be "blacked out," that is, not broadcast within a 75-mile radius of the home team's playing field . . . . Officials of the league and club testified at trial that such a rule boosts team revenue directly by increasing ticket sales and indirectly because a full stadium contributes to a more exciting television program and therefore makes the right to broadcast games more valuable.

<u>Id.</u> at 728.

17

that time, commonly found in American homes, the Court
accordingly held that the showing of the blacked out games was
not protected by the homestyle exemption.   Id.

Defendants may well be correct that their public performance
of Plaintiffs' copyrighted audiovisual works for their customers
using the DISH Network service was protected by the homestyle
exemption, given that such satellite television services,
including the types of satellite dish antennae they employ, are
today, clearly likely to be "commonly found in the home".
Plaintiffs' Complaint, however, does not allege that the mere
showing of their copyrighted audiovisual works to Defendant
Flying J's customers was unauthorized.   As Defendants
acknowledge, Plaintiffs "do not allege that public display of
their content by Flying J would violate [Plaintiffs'] public
performance rights if Flying J were not using the segOne device."
(Defs'. Motion to Dismiss at 5.)   Plaintiffs clearly do not
"intend that their work not be performed at all."   McBee &
Bruno's, 792 F.2d at 731.

Rather, the Complaint alleges that Defendants' copyright
infringement stems from their unauthorized public performance of
Plaintiffs' copyrighted audiovisual works along with the
advertising content that Defendants produce and televise through
their Plaza TV service on behalf of their own advertising

18

customers.  On either a plain reading of section 110(5)(A) or by
reference to the tests discussed in Claire's Boutiques and McBee
& Bruno's, Defendants' mere public performance of Plaintiffs'
copyrighted audiovisual works would likely be protected by the
homestyle exemption.  However, Defendants' allegedly infringing
conduct, involving the replacement of advertisements using the
segOne technology in conjunction with the public performance of
Plaintiffs' copyrighted works, does not implicate the homestyle
exemption.

     The Court is of the opinion that the homestyle exemption was
not designed to apply to the particular allegations of copyright
infringement contained in the Complaint.  Were the Court to find
that the homestyle exemption potentially protects the particular
conduct that Plaintiffs allege is infringing, it would
effectively be reading a new right into the plain language of 17
U.S.C § 110(5)(A).  The exemption protects "ordinary radios and
television sets" that make unauthorized use of copyrighted works
"for the incidental entertainment of patrons in small businesses
or other professional establishments."  See S. Rep. No. 938, 93d
Cong., 2d Sess. 130 (1974).  The plain language of the statute is
not susceptible to an interpretation that would extend such
protection to a brand new commercial technology that is instead
apparently designed to increase competition in the television

19

advertising business.   It would be entirely improper for the
Court to construe the homestyle exemption in such a manner.   <u>Cf.</u>
<u>Sony Corp. of America v. Universal City Studios, Inc.</u>, 464 U.S.
417, 431 (1984) (observing that "The judiciary's reluctance to
expand the protections afforded by the copyright without explicit
legislative guidance is a recurring theme . . . . Sound policy,
as well as history, supports our consistent deference to Congress
when major technological innovations alter the market for
copyrighted materials.   Congress has the constitutional authority
and the institutional ability to accommodate fully the varied
permutations of competing interests that are inevitably
implicated by such new technology") (citations omitted).

    Moreover, as <u>Claire's Boutiques</u> and <u>McBee & Bruno's</u> both
demonstrate, whether a device is of "a kind commonly used in
private homes" is a factual determination.   Even if the Court had
found that the homestyle exemption potentially applied here - and
it does not - Plaintiffs have, at this stage, adequately plead
that Defendants are not entitled to its protection.   The
Complaint may fairly be construed as alleging that the segOne
devices used by Defendants in conjunction with satellite dish
antennae are not commonly used in private homes:   "the integrated
commercial replacement system employed by Defendants in
displaying Plaintiffs' works and networks is according to

20

SegOne's website, targeted not to consumers but to 'national corporate accounts.'"  (Complaint ¶ 23 & Ex. 1.)  Defendants' Motion to Dismiss on the grounds that its conduct fell within the protection of the homestyle exemption is therefore DENIED.


    C.   The Unfair Competition Claim

Plaintiffs allege that Defendants have engaged in unfair competition "under the common law" but without specifying the law of any particular state.  (<u>Id.</u> ¶ 40.)  While Plaintiffs argue that they "have not stipulated to the application of New York law to Defendants' nationwide course of conduct," (Pls'. Opposition at 13 n.8), the Complaint alleges that Plaintiffs have been harmed by Defendants' alleged conduct in New York.  (<u>Id.</u> ¶ 3.) Accordingly, for the purposes of this motion, the Court will evaluate Plaintiffs' unfair competition claim under New York law.

    1.   New York's unfair competition cause of action

New York's unfair competition cause of action has been broadly described as encompassing "'any form of commercial immorality,' or simply as 'endeavoring to reap where (one) has not sown'; it is taking 'the skill, expenditures and labors of a competitor' . . . and 'misappropriati(ng) for the commercial advantage of one person . . . a benefit or 'property' right belonging to another.'"  <u>Roy Export</u>, 672 F.2d at 1105 (quoting

21

Metropolitan Opera, 101 N.Y.S.2d at 488-89, 492; Int'l News
Service v. Associated Press, 248 U.S. 215, 239 (1918);
Electrolux Corp. v. Val-Worth, Inc., 190 N.Y.S.2d 977, 986
(1950)).  New York courts have, however, clearly articulated
that an element of bad faith is essential to establishing
liability on a claim of unfair competition.  See Saratoga Vichy
Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980)
("The essence of an unfair competition claim under New York law
is that the defendant has misappropriated the labors or
expenditures of another . . . . Central to this notion is some
element of bad faith") (citations omitted); Genesee Brewing Co.
v. Stroh Brewing Co., 124 F.3d 137, 149 (2d Cir. 1997) ("Under
New York law, common law unfair competition claims closely
resemble Lanham Act claims except insofar as the state law claim
may require an additional element of bad faith or intent");
Noble v. Great Brands of Europe, Inc., 949 F. Supp. 183, 188
(S.D.N.Y. 1996) (observing that unfair competition involves "the
bad faith misappropriation of the labors and expenditures of
another"); Lane Capital Mgmt., Inc. v. Lane Capital Mgmt. Inc.,
15 F. Supp.2d 389, 400 (S.D.N.Y. 1998) (observing that record
"does not establish with clarity that defendant acted in bad
faith, an essential element of unfair competition").

22

Plaintiffs' unfair competition claim alleges that Defendants, through their Plaza TV service, enable advertisers to "convert and usurp for their own financial gain the advertising opportunities created by the television programming of Plaintiffs and others." (Complaint ¶ 23.) Plaintiffs contend that they and other broadcast networks and cable channels rely on "commercial time sold to advertisers for viewing by the television public" as their primary sources of revenue. (<u>Id.</u> ¶ 20.) Selling television advertising is also "the means by which networks and cable channels are able to make television programming available to their viewers." (<u>Id.</u>) Moreover the "opportunity and ability to sell commercial time on television networks, programming services, and cable channels is engendered by the popularity and appeal of the copyrighted television programming for which it is sold." (<u>Id.</u> ¶ 37.) In an allegation that overlaps with their copyright infringement claim, Plaintiffs allege that Defendants unfairly compete against them by misappropriating the popularity of their copyrighted television programming "along with the ability and valuable opportunity to sell commercial advertising time associated with that programming." (<u>Id.</u> ¶ 38.) Defendants allegedly sell "commercial time during the breaks in Plaintiffs' and others' copyrighted television programming – the same

23

commercial time on which Plaintiffs depend – to advertisers who want to market their goods and services to truckers and others within the Flying J customer demographic." (<u>Id.</u> ¶ 22.) It can be readily inferred from the Complaint that Defendants, while allegedly engaging in the television advertising business, are neither exclusive licensees nor producers of copyrighted television programming. Defendants' main business is operating a nationwide chain of truck-stop facilities. (Complaint ¶ 19.) Plaintiffs specifically allege, however, that Defendants' Plaza TV service charges advertisers "more than $30,000 per month to air 30-second commercials" that are used to "replace the commercials that Plaintiffs and others have already sold to advertisers for viewing in conjunction with Plaintiffs' television programming." (<u>Id.</u> ¶ 22.) In this way, Defendants' alleged conduct not only deprives Plaintiffs' advertising customers of what they paid for – the opportunity to have their advertisements seen by the television viewing public – but also deprives Plaintiffs of advertising customers who might otherwise purchase television advertising time from them. (<u>Id.</u> ¶¶ 21-22.) The gravamen of the unfair competition claim is thus that Defendants directly compete against Plaintiffs in the television advertising business by selling television advertising time to advertising customers, by using Plaintiffs' copyrighted

24

programming, but without incurring the expenses that Plaintiffs incur in producing or exclusively licensing the copyrighted television programs on which the business generally depends. (<u>Id.</u> ¶ 40.)  Plaintiffs thus characterize Plaza TV as a "parasitic" advertising business through which "Defendants are reaping what they have not sown and have taken the skill, expenditures, and/or labors of Plaintiffs and used them to compete against Plaintiffs for their own commercial advantage." (<u>Id.</u> ¶ 38.)

2.    Preemption by federal copyright law

Defendants argue, however, that the unfair competition claim contained in Count Two of the Complaint should be dismissed because it is preempted by federal copyright law.  They contend that the Complaint does not contain any factual allegations that would distinguish "the unfair competition claim from the copyright claim."  (Defs'. Reply at 8.)

Under 17 U.S.C. § 301, federal copyright laws preempt state law claims that seek to vindicate "legal or equitable rights that are equivalent" to those already protected by federal copyright law, and the work in question falls within the type of works protected by copyright law.  <u>See</u> <u>Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.</u>, 373 F.3d 296, 305 (2d Cir. 2004) (quoting <u>National Basketball Ass'n v. Motorola, Inc.</u>, 105 F.3d

25

841, 848 (2d Cir. 1997)).  Unless a state law claim contains

"extra elements that make it qualitatively different from a

copyright infringement claim" it is preempted by federal law and

must be dismissed.  Id.  To determine whether a claim is

qualitatively different, the court should consider "what [the]

plaintiff seeks to protect, the theories in which the matter is

thought to be protected and the rights sought to be enforced."

Id. at 306 (quoting Computer Assoc. Int'l, Inc. v. Altai, 982

F.2d 693, 716 (2d Cir. 1992)).

Plaintiffs' characterization of Defendants' Plaza TV service

as "parasitic" and as having misappropriated Plaintiffs' labor

and expenditures for their own commercial advantage certainly

suggests that Defendants are accused of having acted in bad

faith.  The Court finds, however, that Plaintiffs' unfair

competition claim is not qualitatively different from their

copyright infringement claim.

Plaintiffs' copyright infringement claim seeks to protect

their exclusive right to perform publicly, or authorize others

to perform publicly, fifteen specific copyrighted audiovisual

works.  By contrast, Plaintiffs contend that the unfair

competition claim seeks to restrain Defendants from directly and

unfairly competing in the general television advertising

business, regardless of whether Defendants infringe on

26

Plaintiffs' copyrights and exclusive licenses or those of
others.  Plaintiffs argue that they seek to protect the valuable
"right to sell and append commercial advertising to the
beginning, middle, or end of a film, news show, sitcom, sporting
event, or other program that is shown on television *whether or
not Plaintiffs own the copyrights in those shows*." (Pls'.
Opposition at 14.)  The Complaint does not, however, explicitly
contain any specific allegations in this regard.

Even if the Complaint did contain such allegations,
Plaintiffs' unfair competition claim would still be based on
their right to broadcast or perform audiovisual works which is a
right exclusively within the preserve of federal copyright law.
Plaintiffs' unfair competition claim would not be saved from
preemption simply because they air some television programs
pursuant to non-exclusive licenses.  As the Second Circuit has
observed "[c]opyrightable material often contains
uncopyrightable elements within it, but Section 301 [of the
Copyright Act] preemption bars state law misappropriation claims
with respect to uncopyrightable as well as copyrightable
elements." National Basketball Ass'n, 105 F.3d at 849.  The
legislative history of the Copyright Act provides, in relevant
part:

27

> As long as a work fits within one of the general
> subject matter categories of sections 102 and 103, the
> bill prevents the States from protecting it even if it
> fails to achieve Federal statutory copyright because it
> is too minimal or lacking in originality to qualify, or
> because it has fallen into the public domain.

H.R. No. 94-1476 at 131, <u>reprinted in</u> 1976 U.S.C.C.A.N. at 5747.

The Copyright Act thus "exclusively governs a claim when . . .

the claim seeks to vindicate legal or equitable rights that are

<u>equivalent</u> to one of the bundle of exclusive rights already

protected by copyright law." <u>Briarpatch Ltd.</u>, 373 F.3d at 305

(emphasis added).  The non-exclusively licensed television

programs that Plaintiffs contend could provide the basis for

their unfair competition claim are clearly works that fall

within one of the general subject matter categories protected by

the Copyright Act.  Plaintiffs therefore cannot allege any

"extra elements" that would make their unfair competition claim

"qualitatively different from a copyright infringement claim."

<u>Id.</u> at 306.

Accordingly, Defendants' Motion to Dismiss Count Two of the

Complaint on the grounds that it is preempted by federal

copyright law is GRANTED and Plaintiffs' unfair competition

claim is hereby DISMISSED WITH PREJUDICE.

28

### III. LEAVE TO REPLEAD

Rule 15(a) of the Federal Rules of Civil Procedure requires that courts freely grant leave to amend "when justice so requires."  Fed. R. Civ. P. 15(a).  "[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead." Cohen v. Citibank, 1997 WL 88378 at *2 (S.D.N.Y. 1997).  Absent a showing of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or the futility of the amendment, a plaintiff should be granted leave to replead.  See Protter v. Nathan's Famous Sys., Inc., 904 F.Supp. 101, 111 (E.D.N.Y. 1995) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

However, if an amendment would be futile, a court may deny leave to amend.  See Oneida Indian Nation of N.Y. v. City of Sherrill, 337 F.3d 139, 168 (2d Cir. 2003) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."  Id. (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)).

The Court finds that it would be futile for Plaintiffs to replead their unfair competition claim under New York law. Accordingly, Plaintiffs are DENIED leave to replead their unfair competition claim.

29

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Count One of the Complaint is DENIED.  Count Two of the Complaint is hereby DISMISSED WITH PREJUDICE.  Defendants shall answer within forty five (45) days of the date of this Memorandum and Order.

SO ORDERED.

Dated:    New York, New York

          February 22  , 2007

                                        Deborah A. Batts
                                   United States District Judge

30